CITY OF KETTERING, APPELLANT, *v.* STATE EMPLOYMENT RELATIONS BOARD ET AL., APPELLEES.

[Cite as Kettering *v.* State Emp. Relations Bd. (1986), 26 Ohio St. 3d 50.]

(No. 85-1459—Decided August 20, 1986.)

*Denlinger, Rosenthal & Greenberg, Dean E. Denlinger* and *John W. Fischer,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Loren L. Braverman,* for appellee State Employment Relations Board.

*Logothetis & Pence, Bruce E. Pence* and *Mary Jo S. Korona,* for appellee Teamsters Local 740.

*Berkman, Gordon, Murray & Palda, George W. Palda* and *Richard T. Bush,* for appellee AFSCME.

*Gurley, Rishel, Myers & Kopech* and *Marc E. Myers,* urging affirmance for *amicus curiae,* Ohio Fraternal Order of Police, Inc.

*Jaffy, Livorno, Kaufmann & Arnett Co., L.P.A., Stewart R. Jaffy* and *Henry A. Arnett,* urging affirmance for *amicus curiae,* Ohio Association of Professional Firefighters.

*John D. Maddox,* law director, *Gregory S. Lashutka,* city attorney, *Richard A. Castellini,* city solicitor, *William E. Lang,* city solicitor, *W. McGregor Dixon, Jr.,* law director, *Russell A. Olson,* law director, *Calfee, Halter & Griswold, John E. Gotherman* and *William E. Coughlin,* urging reversal for *amicus curiae,* Ohio Municipal League.

CELEBREZZE, C.J. The issue presented is whether R.C. 4117.01(F)(2), which would require Kettering to bargain collectively with a union representing its police command officers, is constitutional and, if so, whether Kettering's local ordinance runs afoul of that provision. Kettering contends that the management of its police department is a power of local self-government with which the state cannot interfere pursuant to Section 3, Article XVIII of the Ohio Constitution.[1] The city asserts that membership in a union would lead to divided loyalty among police command officers, thus breaking down its ability to control and manage the department. This position has the potential to dismantle the collective bargaining rights granted to municipal employees and in large measure could defeat the laudable purposes of the Public Employees Collective Bargaining Act.[2] For the reasons that follow, we reject the city of Kettering's contention.

---

[1] Section 3, Article XVIII reads as follows:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

[2] Earlier this year, in *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44,* v. *State Emp. Relations Bd.* (1986), 22 Ohio St. 3d 1, this court struck down the so-called "Dayton Amendment" of R.C. 4117.01(F)(2). This amendment, which would have excluded all Dayton police sergeants, lieutenants and captains from participation in the new Public

Initially, it is important to observe that legislative enactments "have a strong presumption of constitutionality." *Benevolent Assn.* v. *Parma* (1980), 61 Ohio St. 2d 375, 377 [15 O.O.3d 450]. As Justice Locher stated in *State* v. *Dorso* (1983), 4 Ohio St. 3d 60, 61, "courts must apply all presumptions * * * so as to uphold, if at all possible, a statute or ordinance assailed as unconstitutional." See, also, *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142 [57 O.O. 134], paragraph one of the syllabus. Thus, in the instant case, Kettering must rebut the presumption of constitutionality attaching to R.C. 4117.01(F)(2).

We conclude that the city has failed to overcome that presumption. The evidence in the record is not convincing regarding appellant's claim that union representation of Kettering's police command officers would indeed interfere with the city's local self-government power to manage the department. To the contrary, there is abundant evidence, including affidavits from chiefs of police and city management, supporting the view that membership in a superior officer's association would *not* lead to divided loyalties or interfere with the city's ability to manage its police department through its command officers.[3]

---

Employees Collective Bargaining Act, R.C. 4117.01 *et seq.,* was found to be violative of Section 26, Article II and Section 2, Article I of the Ohio Constitution. This court refused to deny Dayton's police command officers "the collective bargaining rights enjoyed by all other similarly situated municipal employees in Ohio." *Id.* at 6.

Kettering now claims that it, and other Ohio cities, should be free to exclude police command officers from the Public Employees Collective Bargaining Act in the name of municipal home rule powers.

[3] Among the numerous affidavits in the record is that of Joseph Dominelli, Executive Director of the New York State Association of Chiefs of Police, who stated, *inter alia,* as follows:

"It has been my experience and it is my opinion, that superior officers are professionals in every sense of the word and that they are totally committed to providing the best law enforcement and police protection possible. It is my opinion that membership in a superior officers association would not lead to a division of loyalty so as to impair their ability to perform their sworn duty to provide law enforcement and police protection."

This view is reinforced in the affidavit of Charles C. Petro, Jr., retired Chief of Police of Lakewood, Ohio:

"In all of my experience and contact in the labor relations field I have never heard of a complaint or of a concern by a city official or a police administrator that unionized superior officers have failed or would fail to act in an appropriate manner towards subordinates due to union loyalties, even where superior officers were members of the same union and of the same bargaining unit as their subordinates. Particularly in small or medium-sized communities and within units of larger departments, labor and management work side by side performing some of the same functions, often in life-threatening situations. The strong personal and working relationships which are developed and the paramilitary discipline present in police departments have always taken precedence over the factor of union loyalty and brotherhood."

And, the Deputy Mayor of Akron, Mathew L. Contessa, also stated that union representation of command officers has not lessened that city's ability to manage its police force:

"* * * I am aware of numerous examples of command officers carrying out their disciplinary duties without regard to their union or bargaining unit membership.

Additionally, the Public Employees Collective Bargaining Act itself explicitly preserves the important local self-government management powers. A city may, in accordance with R.C. 4117.08(C):

"(1) Determine matters of inherent managerial policy which include, but are not limited to areas of discretion or policy such as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, and organization structure;

"(2) Direct, supervise, evaluate, or hire employees;

"(3) Maintain and improve the efficiency and effectiveness of governmental operations;

"(4) Determine the overall methods, process, means, or personnel by which governmental operations are to be conducted;

"(5) Suspend, discipline, demote, or discharge for just cause, or lay off, transfer, assign, schedule, promote, or retain employees;

"(6) Determine the adequacy of the work force;

"(7) Determine the overall mission of the employer as a unit of government;

"(8) Effectively manage the work force;

"(9) Take actions to carry out the mission of the public employer as a governmental unit."

Police command officers must, of course, still carry out the legitimate orders of their superiors and are subject to traditional avenues of discipline if they do not. Lawful promotions may still be controlled by the city. The responsibility and authority to control all police department employees therefore remains squarely with the city. Appellant has not demonstrated that requiring it to bargain collectively with its police command officers would work an unconstitutional interference with its local self-government power to manage its police department.

Further, the cities' powers of local self-government are not completely unfettered. This court has previously acknowledged that, in matters of statewide concern, municipal powers of local self-government may be subordinate to the exercise of the state's police powers. This principle was cogently stated in *Cleveland Electric Illuminating Co.* v. *Painesville* (1968), 15 Ohio St. 2d 125, 129 [44 O.O.2d 121], where we held:

"The power granted under Section 3 of Article XVIII relates to local

---

"* * *

"* * * Patrolmen as well as command officers have always performed their duty of directing, investigating and disciplining police officers who were fellow F.O.P. members and members of the same bargaining unit.

"* * * There have been no episodes of which I am aware in which union membership has been a factor in the failure of supervision, administration of discipline, or investigation of infractions of rules.

"* * * As a result of my personal experience, I can say that paramilitary discipline has prevailed in every instance over union loyalties in the Akron Police Department."

matters and even in the regulation of such local matters a municipality may not infringe on matters of general and statewide concern.

"The test as to matters of local self-government is set forth in the opinion of *Beachwood* v. *Board of Elections of Cuyahoga County,* 167 Ohio St. 369, 371 [5 O.O.2d 6]:

" 'To determine whether legislation is such as falls within the area of local self-government, the result of such legislation or the result of the proceedings thereunder must be considered. If the result affects only the municipality itself, with no extraterritorial effects, the subject is clearly within the power of local self-government and is a matter for the determination of the municipality. However, if the result is not so confined it becomes a matter for the General Assembly.'

"Thus, *even if there is a matter of local concern involved, if the regulation of the subject matter affects the general public of the state as a whole more than it does the local inhabitants the matter passes from what was a matter for local government to a matter of general state interest.*" (Emphasis added.) Accord *Columbus* v. *Teater* (1978), 53 Ohio St. 2d 253 [7 O.O.3d 410]; *State, ex rel. Evans,* v. *Moore* (1982), 69 Ohio St. 2d 88, 90 [23 O.O.3d 145]; *State, ex rel. Villari,* v. *Bedford Hts.* (1984), 11 Ohio St. 3d 222; *Weir* v. *Rimmelin* (1984), 15 Ohio St. 3d 55; *State, ex rel. Adkins,* v. *Sobb* (1986), 26 Ohio St. 3d 46.[4]

---

[4] We stated in *Columbus* v. *Teater, supra,* at 257 that "[t]he police power [of the state] and the power of local self-government are constitutional grants of authority equal in dignity. The state may not restrict the exercise of self-government within a municipality. Furthermore, a municipality may exercise the police power within its borders. However, the general laws of the state remain supreme in the exercise of that power, even if the issue is one which might also be a proper subject of municipal legislation." This court, in *Columbus* v. *Teater, supra,* at 260 noted that "various Constitutional Convention pronouncements concerning Article XVIII demonstrate that *the Home Rule Amendment leaves municipal authorities subordinate to the state police power in matters of statewide import.*" (Emphasis added.)

In *Weir* v. *Rimmelin, supra,* at 56, Justice Holmes, writing for the court, explained:

"The Home Rule Amendment to the Ohio Constitution confers a significantly high degree of sovereignty upon municipalities. * * * However, the amendment does not provide cities the absolute power of local self-government. * * * Where the General Assembly has enacted legislation pursuant to the state's police power which governs a statewide concern, the statute takes precedence over ordinances enacted under the home rule authority of municipalities."

In *State, ex rel. Villari, supra,* at 225 we observed that "[w]here a statute addresses matters of general and statewide concern in an area otherwise subject to municipal regulation, the statute will govern."

In *State, ex rel. Adkins, supra,* at 48, Justice Wright, writing for the majority, stated in pertinent part:

"The city argues that it is entitled to regulate the vacation leave of its employees pursuant to its powers of local self-government under Sections 3 and 7, Article XVIII of the Ohio Constitution. State law must govern, however, when a statute addresses a matter of general and statewide concern in an area otherwise subject to municipal regulation."

Further, although Kettering relies on *Benevolent Assn.* v. *Parma, supra,* we note that the *Parma* court specifically stated at 383, fn. 5 that "[t]he concept of statewide concern is not applicable in the instant cause."

The statewide concern doctrine is certainly applicable in the instant case. Undeniably, the General Assembly was exercising its police power to promote the general safety and welfare in enacting the Public Employees Collective Bargaining Act. As we just observed in *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44,* v. *State Emp. Relations Bd.* (1986), 22 Ohio St. 3d 1, 5, prior to passage of the Act there had been over four hundred public employee work stoppages in Ohio between 1973 and 1980. The Act was designed to "minimize the possibility of public-sector labor disputes," to bring "stability and clarity to an area where there had been none," and to "facilitate the determination of the rights and obligations of government employees and employers, and give them more time to provide safety, education, sanitation, and other important services." *Id.*

What the statewide concern doctrine perceives is that a comprehensive statutory plan is, in certain circumstances, necessary to promote the safety and welfare of all the citizens of this state, be they public employees or those whom public employees must serve and protect. As we stated in *State, ex rel. McElroy,* v. *Akron* (1962), 173 Ohio St. 189, 192 [19 O.O.2d 3], "[d]ue to our changing society, many things which were once considered a matter of purely local concern and subject strictly to local regulation, if any, have now become a matter of statewide concern, creating the necessity for statewide control."

Surely this is such a case. Ohio's unfortunate experience with public employee labor strife, described in *Dayton Fraternal Order of Police, supra,* graphically illustrates the need for a statewide framework of collective bargaining for all employees of the state and local governments. The necessity of a statewide approach has been persuasively endorsed by the Supreme Court of California. In *Baggett* v. *Gates* (1982), 32 Cal. 3d 128, 139-140, 185 Cal. Rptr. 232, 649 P. 2d 874, the California high court rejected a home-rule challenge to that state's Public Safety Officers' Procedural Bill of Rights Act, reasoning as follows:

"* * * [I]t can hardly be disputed that the maintenance of stable employment relations between police officers and their employers is a matter of statewide concern. The consequences of a breakdown in such relations are not confined to a city's borders. These employees provide an essential service. Its absence would create a clear and present threat not only to the health, safety and welfare of the citizens of the city, but also to the hundreds, if not thousands, of nonresidents who daily visit there. Its effect would also be felt by the many nonresident owners of property and businesses located within the city's borders. Our society is no longer a collection of insular local communities. Communities today are highly in-

---

In the instant appeal, we believe that public employee collective bargaining is a matter of statewide concern sufficient to prevail over the city's ordinance and that the city has not shown that R.C. 4117.01(F)(2) would, in any event, interfere with its local self-government power to manage its police department.

terdependent. The inevitable result is that labor unrest and strikes produce consequences which extend far beyond local boundaries."

Similarly, the enactment of statutes governing public-sector labor relations in Ohio has become a matter of statewide concern which, in the instant case, must prevail over Kettering's attempt to nullify a key and unambiguous statutory provision of the Public Employees Collective Bargaining Act. A myopic insistence on returning a significant portion of Ohio's public employee labor relations to the pre-Act *ad hoc* "system," under the rubric of local self-government powers, only invites a return to the very litigation and controversy which had prompted the General Assembly to address that distressing state of affairs.[5] We therefore hold that R.C. 4117.01(F)(2) is constitutional and does not violate a municipality's right to exercise its powers of local self-government under Section 3, Article XVIII of the Ohio Constitution.

For the foregoing reasons, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, C. BROWN and DOUGLAS, JJ., concur.

DOUGLAS, J., concurs with opinion.

LOCHER, HOLMES and WRIGHT, JJ., dissent.

DOUGLAS, J., concurring. While much is made in the brief of appellant concerning home rule and the right of local legislative bodies to lawfully regulate and restrict the rights of police and fire command officers to organize and bargain collectively seeking their legitimate goals, that is only a silent front for what this case really involves. The real issue in this case is whether or not the legislation providing a comprehensive, statewide system of collective bargaining for public employees, as codified in R.C. Chapter 4117, is constitutional and thus applicable to *municipal* employers and employees.

To say or imply that this case is anything but a frontal attack on Ohio's new Public Employees Collective Bargaining Act ("Act") is to misstate the case and is intended only to lull those who accept the proposition into a state of false security. To be so deluded can be frightening at best and disastrous at worst.

---

[5] Further, if the appellant city wishes to challenge the wisdom of the Public Employees Collective Bargaining Act, its resort is to the legislature and the political process rather than to the courts. It is fundamental that courts do not sit to determine the wisdom of legislation. *State, ex rel. Downing,* v. *Peters* (1932), 125 Ohio St. 108; *State, ex rel. Bracken,* v. *Weber* (1939), 136 Ohio St. 140 [16 O.O. 77]; *Perry* v. *Indus. Comm.* (1954), 160 Ohio St. 520 [52 O.O. 387].

In *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44,* v. *State Emp. Relations Bd.* (1986), 22 Ohio St. 3d 1, we fully set forth the background, reasons and need for the new Act. There is no need to repeat that discussion herein except to say that the passage of the Act provided a badly needed framework for governing the labor relations of public employers and their employees.

We also held in *Dayton* that the collective bargaining law is a law of a general nature having a uniform operation throughout the state of Ohio and thus complies with the mandate of Section 26, Article II of the Ohio Constitution. In so holding, we found that the Act "* * * affects persons in every county of the state." *Id.* at 5. It is a mystery then as to the origin of this eleventh hour constitutional challenge to a provision of the Act that clearly has uniform operation throughout the state and is of a general nature.

It is pertinent to note matters of historical importance, other constitutional provisions and precedent pertinent to a resolution of the matter before us. Section 3, Article XVIII of the Ohio Constitution, the so-called Home Rule Amendment, was drafted and recommended for adoption at the Ohio Constitutional Convention of 1912. However, that is not all that was forthcoming from that convention. A number of measures, dealing with the welfare and rights of employees, also emerged. Among those provisions was Section 33, Article II, dealing with mechanics' liens; Section 35, Article II, authorizing a workers' compensation system; Section 37, Article II, providing for an eight-hour day for employees engaged in public works; and Section 41, Article II, setting forth restraints upon the exploitation of prison labor for competitive advantage.

Probably the most comprehensive of the provisions was Section 34, Article II, which manifested the broad purpose of proclaiming and securing to the General Assembly the power to enact legislation establishing employee rights and protections. Section 34, Article II of the Ohio Constitution provides:

"Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; *and no other provision of the constitution shall impair or limit this power."* (Emphasis added.)

Again, it should be emphasized that the foregoing section was adopted *at the same time* as was the home-rule section. It should be obvious that the drafters of the various sections consciously included, in Section 34, Article II, a broad grant of authority to pass laws "for the comfort, health, safety and general welfare of all employes" and then provided further that no other provision of the Constitution shall limit the power to enact legislation for the welfare of employees. If this section is read in the way in which it is written, there is no conflict on this subject between state legislative authority and the power granted local governments under home rule.

Pursuant to its constitutonal and general legislative authority, the General Assembly enacted Am. Sub. S.B. No. 133 in an effort to bring some order to the many problems existing in public employee labor relations. In enacting a uniform system, the legislature made the conscious decision to include all police officers and fire fighters, excepting only chiefs of the departments and those authorized to act for the chiefs. R.C. 4117.01(F)(2). This decision recognized that such persons have, in the past, been organized and represented by the Fraternal Order of Police, the International Association of Professional Fire Fighters and/or other command officers' associations. Thus, the General Assembly simply codified the past practice of most Ohio cities in granting bargaining rights to police and fire sergeants, lieutenants and captains.

In addition, the majority decision is supported by clear precedent on the question now before us. In *State, ex rel. Bd. of Trustees of Pension Fund,* v. *Bd. of Trustees of Relief Fund* (1967), 12 Ohio St. 2d 105 [41 O.O.2d 410], this court answered the very same issue presented to us in this case. In *Bd. of Trustees*, this court was called upon to interpret Section 34, Article II of the Ohio Constitution. The issue in that case was the validity of the state-controlled and -administered disability and pension fund for police and fire fighters. As a member of the Toledo City Council in 1967, I was the council's representative and member of the Toledo police local municipal pension fund board. The General Assembly enacted a law abolishing local municipal pension funds and provided that all of the assets in such local pension funds be transferred to the state-administered fund. This law was challenged as being in violation of home rule.

A unanimous Supreme Court, in interpreting Section 34, Article II, wasted no time in disposing of the home-rule argument. The court said, at 107, that "[t]here can be no question that the adopters, the people, intended this section of the Constitution to apply both to *local government* and state employees. The cities and towns and other political subdivisions of the state of Ohio constitute en masse one of the largest of the employers in the state. It is our conclusion *that the firemen and police of various localities of Ohio are employees within the scope of this provision.* It appears in clear, certain and unambiguous language that *no other provision of the Constitution* may impair the intent, purpose and provisions of the above section of Article II." (Emphasis added.)

Giving a literal reading to the constitutional provision and *Bd. of Trustees*, it would seem to follow that any municipal ordinance, such as the one enacted by appellant Kettering, which conflicts with R.C. Chapter 4117 is invalid despite the municipalities' power of local self-government. It is hard for me to conceive what could be more of a subject of the general welfare of employees than to have the right to collectively bargain concerning wages and other conditions of employment.

Two more points need to be made. First, appellant takes great pains to assure us that we are being called upon to deal only with a single subsec-

tion of the collective bargaining Act set forth in R.C. Chapter 4117, and specifically that we are not passing upon any other section than the one before us. This is clearly the wolf in sheep's clothing. If appellant's arguments are accepted to deprive certain fire and police officers of their rights conferred pursuant to R.C. Chapter 4117, then can anyone seriously believe that the argument will not soon be made that employees working in, and in charge of, the municipal water plant, refuse collection, snow removal and salting the roads, and other employees who engage in authorized concerted action, will not also be affecting the life, liberty and property of persons within the territory of the municipal corporation, when the concerted activity occurs under conditions construed to be an emergency? This is especially so since under the Act such employees are given the right to strike, subject to the provisions of R.C. 4117.16, and the fire and police employees are specifically prohibited from doing so. See R.C. 4117.14(D)(1) and (2); 4117.15; and 4117.23.

Secondly, there is a practical problem with accepting appellant's position. If we were to hold unconstitutional R.C. 4117.01(F)(2), part of the definitional section of the Act, we would in fact be saying that all of the command officers in every police and fire department in this state are "supervisors." Pursuant to R.C. 4117.01(C)(10), supervisors are not public employees under the Act. Thus, while such a holding would strip the police and fire command officers of the benefits and the protections of the Act, it follows that they also would be relieved of the duties, obligations and proscriptions of the Act. With the Ferguson Act having been mercifully repealed, such a decision would leave the officers in question in a position to engage in a strike without penalty, except that which might lawfully be meted out by administrators pursuant to civil service regulations. While this is highly unlikely to occur, given the professionalism and dedication of fire and police personnel, such a result would insure our return to the days when chaos was the order of the day.

It is my judgment that to rule in favor of appellant would be taking one giant step backward in the evolving relationship in Ohio between public employers and their employees. The practical effect of such a decision would be to once again relegate certain of Ohio's municipal employees to second-class citizenship. History, the Ohio Constitution, statutes, precedent and just plain fundamental fairness would seem to militate against such a result.

The legislature of this state has given us a workable solution to a difficult problem. We should not disturb that legislative wisdom which has provided for this state a sensible approach to public employment labor relations.

I join with the majority in affirming the judgment of the court of appeals.

LOCHER, J., dissenting. The majority's position today is in derogation of the Ohio Constitution and well-established legal doctrine by this court. For the reasons to follow, I am compelled to dissent.

Section 3, Article XVIII of the Ohio Constitution empowers municipalities "[t]o exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." When this home-rule provision was adopted by amendment to the Ohio Constitution, this court found that "the people of the municipality are given power to construct the machinery of their own local government and to operate it themselves." *Froelich* v. *Cleveland* (1919), 99 Ohio St. 376, 391. This court has since held that the municipality's power to enact laws for local self-government is not restricted by the words, " 'as are not in conflict with general laws,' " since this phrase limits only the municipality's power to adopt " 'local police, sanitary, or other similar regulations.' " *Dies Elec. Co.* v. *Akron* (1980), 62 Ohio St. 2d 322, 325 [16 O.O.3d 365], citing *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191 [5 O.O.2d 481], paragraph four of the syllabus; and *State, ex rel. Petit,* v. *Wagner* (1960), 170 Ohio St. 297 [10 O.O.2d 344]. See, also, *Benevolent Assn.* v. *Parma* (1980), 61 Ohio St. 2d 375, 378 [15 O.O.3d 450] (municipal compensation ordinance is a matter of local self-government and prevails over conflicting general laws); and *State, ex rel. Bindas,* v. *Andrish* (1956), 165 Ohio St. 441 [60 O.O. 92], paragraphs one and two of the syllabus (municipality may determine qualifications of its council despite different general laws).[6]

We must first determine if the city's having a direct relationship with its sergeants, lieutenants, and captain is a power of local self-government. No definitive description of such powers exists, but they have been interpreted as including the following: to select the municipality's own officers, *State, ex rel. Bailey,* v. *George* (1915), 92 Ohio St. 344, paragraph one of the syllabus; to provide a procedure for nomination of its officers different from what the general laws demand, *Fitzgerald* v. *Cleveland* (1913), 88 Ohio St. 338; to reinstate firemen and patrolmen, even though at variance with state statute, 1977 Ohio Atty. Gen. Ops. No. 77-062; to regulate compensation to employees despite a Revised Code section on point, *Benevolent Assn.* v. *Parma, supra;* to exclusively control allocation of fire

---

[6] Decisions holding that the local ordinance must yield to a conflicting general law of the state have traditionally involved only local police, sanitary, and other regulations, not local powers of self-government. See, *e.g., Eastlake* v. *Bd. of Bldg. Stds.* (1981), 66 Ohio St. 2d 363 [20 O.O.3d 327] (construction safety); *Canton* v. *Whitman* (1975), 44 Ohio St. 2d 62 [73 O.O.2d 285] (water fluoridation); *Cleveland Elec. Illum. Co.* v. *Painesville* (1968), 15 Ohio St. 2d 125 [44 O.O.2d 121] (electric lines); and *Bucyrus* v. *Dept. of Health* (1929), 120 Ohio St. 426 (sewage dumping). In *State, ex rel. Villari,* v. *Bedford Hts.* (1984), 11 Ohio St. 3d 222, where the general law concerned earned but unused vacation leave, arguably a matter of local self-government rather than a police regulation, the general law prevailed but there *was no local regulation* on point with which to conflict.

companies, *Novak* v. *Perk* (1980), 64 Ohio St. 2d 43 [18 O.O.3d 251]; to regulate parks and recreational areas, *McDonald* v. *Columbus* (1967), 12 Ohio App. 2d 150 [41 O.O.2d 228]; to establish a sick-leave policy for the municipality's employees, including police and fire departments, even though such policy would grant less sick leave than provided for by general law, 1983 Ohio Atty. Gen. Ops. No. 83-085; to authorize construction of parking facilities, *State, ex rel. Gordon,* v. *Rhodes* (1951), 156 Ohio St. 81, 88 [45 O.O. 93], and of stadiums, *Bazell* v. *Cincinnati* (1968), 13 Ohio St. 2d 63 [42 O.O.2d 137], certiorari denied (1968), 391 U.S. 601; and eminent domain, *State, ex rel. Bruestle,* v. *Rich* (1953), 159 Ohio St. 13, paragraph seven of the syllabus. Further, these powers generally include procedures by which a city conducts its decision-making process, *Hills & Dales, Inc.* v. *Wooster* (1982), 4 Ohio App. 3d 240, 242, and regulation of whatever is purely local, purely municipal, and purely governmental, *State, ex rel. Toledo,* v. *Cooper* (1917), 97 Ohio St. 86, 91.

In light of the above examples of local self-government powers, I cannot agree with appellees' contention that the city's ordinance excluding supervisors, even in police forces, from collective bargaining is merely an exercise of municipal police power which must yield to conflicting general laws under the latter half of Section 3, Article XVIII of the Ohio Constitution. Simply because an ordinance may deal with or affect the municipality's police force does not make such an ordinance a "police" regulation. *State, ex rel. Canada,* v. *Phillips, supra,* at paragraph five of the syllabus. That court also held that operating a police department is an exercise of local self-government powers. *Id.* at paragraph seven of the syllabus.

Because Kettering's seventeen command officers have responsibilities which include assigning duties to and directing the performance of lower-ranking police officers, recommending and effectuating discipline, training, evaluation, promotion, budgetary and affirmative action procedures, and developing and executing department policy, they are clearly an integral part of Kettering's local self-government. It is extremely important to recognize the potential for conflicts of authority between union officials and the municipal executive branch, and the ensuing potential safety concerns in the event of illegal strikes or some other state of emergency in which the local government's control over its police command officers must be unfettered.

The city's interest in a direct relationship with its command officers, much more so than with its patrol officers, "relate[s] * * * to the administration of the internal local affairs," and thus is not subject to state regulation under *Beachwood* v. *Bd. of Elections* (1958), 167 Ohio St. 369, 371 [5 O.O.2d 6], and *Toledo* v. *State, ex rel. Lawler* (1935), 51 Ohio App. 329 [5 O.O. 256]. Such interest also goes to the power to protect life, liberty and property of persons within the territory of the municipal corporation referred to in *Youngstown* v. *First National Bank* (1922), 106 Ohio St. 563, 575, and involves functions of government which relate to the locale,

protected from state interference under *Fitzgerald* v. *Cleveland, supra,* at 344. A city's relationship with its command officers is also distinct from the relationship with its patrol officers under the test set forth in *State, ex rel. Toledo,* v. *Cooper, supra,* since the latter can be considered purely local and purely municipal but only the former can also be considered purely governmental. It is the manner in which local government decision-making is conducted that is the key to the constitutional protection of powers under the home-rule provision. See *Hills & Dales, Inc.,* v. *Wooster, supra.* Since patrol officers in Kettering do not appear to participate in such processes, and command officers do, it is only the latter who are protected by the home-rule provisions against state regulation.[7]

The majority suggests, in its second footnote, that *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44,* v. *State Emp. Relations Bd.* (1986), 22 Ohio St. 3d 1, is relevant to this cause. This contention is groundless because *Dayton* involved an equal protection attack on a specific provision of the statute that made a special exemption for one municipality. The home-rule question was never addressed. Moreover, the "strong presumption" of statutory validity asserted by the majority

---

[7] In only one case has a plurality of this court held, against my dissent, that a local exercise of self-government power must yield to a state law — *State, ex rel. Evans,* v. *Moore* (1982), 69 Ohio St. 2d 88 [23 O.O.3d 145]. There, without taking notice of the traditional distinction between powers of local self-government and local police powers, the supremacy of the general laws over both powers was conditioned upon: (1) the general laws manifesting a statewide concern, and (2) the general laws having a significant extraterritorial effect beyond the scope of any municipality's local self-government or police powers. This aberrant holding is inapplicable to the instant case where, although it is clear that the General Assembly has manifested a statewide concern for the support of collective bargaining by adopting R.C. Chapter 4117, the general law requiring municipalities to recognize and collectively bargain with representatives of their command officers cannot be beyond the scope of the municipality's local self-government powers.

This court has never held that a statewide concern in and of itself outweighs a local interest in directing its police force's command officers. Additionally, the *Evans* court did not overrule a line of cases holding that the only limits on local self-government powers are provisions of the Constitution or statutes authorized by such provisions. *Bazell* v. *Cincinnati, supra; Benjamin* v. *Columbus* (1957), 167 Ohio St. 103 [4 O.O.2d 113], paragraphs two, three and four of the syllabus; and, *State, ex rel. Bruestle,* v. *Rich, supra,* at paragraph nine of the syllabus. Since Section 34, Article II of the Ohio Constitution does not apply to R.C. 4117.01(F)(2), there is no constitutional provision which can protect it from a home-rule attack.

It must be remembered that the "statewide concern" test set forth by *Cleveland Elec. Illum. Co., supra,* at 129, provides that: "[E]ven if there is a matter of local concern involved, if the regulation of the subject matter affects the general public of the state as a whole more than it does the local inhabitants the matter passes from what was a matter for local government to a matter of general state interest." The city's interest in directly regulating its commanding police officers can not be outweighed by the state's interest in encouraging collective bargaining, because the latter does not affect the general public *more than* the city's relationship with its commanding officers affects its inhabitants. Thus, this relationship must stay intact, while the patrol officers fall within R.C. Chapter 4117.

should not serve as an excuse to ignore the provisions of the state Constitution as this court recognized in *Dayton*. We should not now ignore the home-rule provisions of our Constitution when clearly applicable to a matter involving only the city of Kettering and not a statewide concern.

It was my view that *State, ex rel. Evans, v. Moore* (1982), 69 Ohio St. 2d 88 [23 O.O.3d 145], was anathema to an analytically sound home-rule analysis. *Id.* at 95. Similarly, the instant result is achieved in derogation of established home-rule principles and not based upon statutes, as is the constitutionally infirm law today, but rather upon the primacy of basic Ohio constitutional provisions. While the new Ohio collective bargaining law may be a laudable piece of legislation passed with the best of intentions, it cannot and should not signal the end of home rule. Accordingly, I would reverse the court of appeals and find that R.C. 4117.01(F)(2) is unconstitutional as violative of Kettering's right to exercise its powers of local self-government under Section 3, Article XVIII of the Ohio Constitution. I therefore dissent.

HOLMES, J., concurs in the foregoing dissenting opinion.

WRIGHT, J., dissenting. While I respectfully dissent from the results reached by the majority on the facts of this case, I wish to stress the narrow basis of my reasons. Kettering's position is persuasive because of its clear and overriding interest in controlling its police command officers, which, in my view, falls within Kettering's powers of local self-government under Section 3, Article XVIII of the Ohio Constitution.

I believe that municipalities are entitled to deal directly with a limited number of command officers of its police force due to the necessarily paramilitary nature of such a municipal operation. To that extent today's opinion is an incorrect result.