CITY OF ROCKY RIVER, APPELLANT, *v.* STATE EMPLOYMENT
RELATIONS BOARD ET AL., APPELLEES.

[Cite as Rocky River *v.* State Emp. Relations Bd. (1988), 39 Ohio St. 3d 196.]

(No. 87-157—Submitted March 8, 1988—Decided November 2, 1988.)
(Rehearing granted February 10, 1989.)

*Calfee, Halter & Griswold, Mark I. Wallach, William E. Coughlin, John E. Gotherman* and *Russell A. Olson,* law director, for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Loren L. Braverman,* for appellee State Employment Relations Board.

*Joseph W. Diemert, Jr. & Associates Co., L.P.A., Joseph W. Diemert, Jr.* and *William F. Schmitz,* for appellee Rocky River Firefighters Assn., Local 695.

*Berkman, Gordon, Murray & Palda, George W. Palda* and *Lorraine R. Baumgardner,* for appellee AFSCME Ohio Council 8.

*Conway, Barclay, Deyo & Kurant Co., L.P.A.,* and *Donald K. Barclay,* urging reversal for *amicus curiae,* Ohio Municipal League.

MOYER, C.J. The issue of first impression presented in this case is whether R.C. 4117.14(I), which mandates binding arbitration for collective bargaining disputes between the exclusive representatives of municipal safety forces and a municipal employer, is unconstitutional to the extent that it violates the city of Rocky River's powers of local self-government and is an improper delegation of legislative power. For the reasons stated below, we answer that question in the affirmative and accordingly reverse the judgment of the court of appeals.

I

R.C. 4117.14(I) states:

"The issuance of a final offer settlement award constitutes a binding mandate to the public employer and the exclusive representative to take whatever actions are necessary to implement the award."

The city initially challenges R.C. 4117.14(I) as a violation of its powers of local self-government, usurping its power to set the wages of its safety forces. The general provisions creating municipal home rule in Ohio are found in Sections 3 and 7, Article XVIII of the Ohio Constitution. Section 3, Article XVIII states:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

Section 7, Article XVIII reads:

"Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government."

Any serious student of Ohio juris-

prudence must conclude that the contention created in the process of defining "local self-government" and the authority to adopt local police, sanitary and other similar regulations that are not in conflict with general laws is a contention that is matched by few other areas of the law.

In *State, ex rel. Toledo, v. Lynch* (1913), 88 Ohio St. 71, 97, 102 N.E. 670, 673, Chief Justice Shauck defined "home-rule powers" succinctly as "such powers of government as, in view of their nature and the field of their operation, are local and municipal in character."

This court has repeatedly recognized the power of a municipality to establish wages for its employees. In *Northern Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St. 2d 375, 383, 15 O.O. 3d 450, 455, 402 N.E. 2d 519, 525, we cited *State, ex rel. Mullin, v. Mansfield* (1971), 26 Ohio St. 2d 129, 55 O.O. 2d 239, 269 N.E. 2d 602, in holding that: "It has been firmly established that the ability to determine the salaries paid to city employees is a fundamental power of self-government." We have also observed that "[a] municipality which incorporates the provisions of the Revised Code relating to municipal civil service in its charter does not, in view of R.C. 124.14(B), divest city council of its authority to determine wages of city employees, nor does it empower the municipal civil service commission to order standardization of wages of the employees of the municipality." *Teamsters Local Union No. 377* v. *Youngstown* (1980), 64 Ohio St. 2d 158, 18 O.O. 3d 379, 413 N.E. 2d 837, syllabus.

And, we have held that, "[n]ot only does city council have the authority to determine the wages of city employees under Section 10 of the charter, but it also has that authority as a power of local self-government under Section 3

of Article XVIII of the Ohio Constitution regardless of whether a charter has been adopted. See *State, ex rel. Mullin,* v. *Mansfield, supra; Northern Ohio Patrolmen's Benevolent Assn.* v. *Parma* (1980), 61 Ohio St. 2d 375; *Craig* v. *Youngstown* (1954), 162 Ohio St. 215." *Id.* at 162, 18 O.O. 3d at 382, 413 N.E. 2d at 840. In 1982 the court applied *Teamsters Local Union No. 377* v. *Youngstown, supra,* when it stated: "Our decision in *Teamsters* recognizes that a municipality need not adhere to the pay ranges and schedule of rates set forth in R.C. 124.15(A), given the power of city council to determine wages of city employees. Accordingly, a civil service commission has no power to order standardization of wages of city employees performing similar duties. The city is free to establish its own pay scale." *State, ex rel. Vukovich,* v. *Youngstown Civil Service Comm.* (1982), 69 Ohio St. 2d 16, 19, 23 O.O. 3d 42, 44, 430 N.E. 2d 452, 454.

Appellees maintain that R.C. 4117.14(I) was enacted by the General Assembly for the protection of the health, safety, and welfare of the citizens of Ohio and, as such, is a general law applicable to municipalities, notwithstanding Section 3, Article XVIII of the Ohio Constitution. Further, appellees argue that R.C. 4117.14(I) manifests a statewide concern for the integrity of the collective bargaining process in the public sector, and has significant extraterritorial effects affecting the general public of the state more than the residents of any single municipality.

Appellee Firefighters Association cites *Weir* v. *Rimmelin* (1984), 15 Ohio St. 3d 55, 56, 15 OBR 151, 152, 472 N.E. 2d 341, 343, in support of its position:

"Where the General Assembly has enacted legislation pursuant to the state's police power which governs a

statewide concern, the statute takes precedence over ordinances enacted under the home rule authority of municipalities. *Clermont Environmental Reclamation Co.* v. *Wiederhold* (1982), 2 Ohio St. 3d 44; *State, ex rel. Evans,* v. *Moore* (1982), 69 Ohio St. 2d 88 [23 O.O. 3d 145]; *Cleveland Elec. Illum. Co.* v. *Painesville* (1968), 15 Ohio St. 2d 125 [44 O.O. 2d 121]."

The clause in Section 3, Article XVIII, "as are not in conflict with general laws," does not modify the clause "powers of local self-government"; it modifies only "local police, sanitary and other similar regulations." *Novak* v. *Perk* (1980), 64 Ohio St. 2d 43, 45-46, 18 O.O. 3d 251, 252, 413 N.E. 2d 784, 786; *Teamsters Local Union No. 377* v. *Youngstown, supra,* at 160, 18 O.O. 3d at 380, 413 N.E. 2d at 839, fn.1; *Dies Electric Co.* v. *Akron* (1980), 62 Ohio St. 2d 322, 325, 16 O.O. 3d 365, 367, 405 N.E. 2d 1026, 1028; *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 197, 5 O.O. 2d 481, 485, 151 N.E. 2d 722, 727-728.

" 'As we view it, this constitutional provision [Section 3, Article XVIII] first gives municipalities "authority to exercise all powers of local self-government," and then, with respect to some of those powers, *i.e.,* the power "to adopt and enforce * * * local police, sanitary and other similar regulations," it limits the powers to adopt such regulations to such "as are not in conflict with general laws." However, the limitation is only such a limited limitation.' *Id.* at 197, 5 O.O. 2d at 485, 151 N.E. 2d at 727.

"See, also, *State Personnel Bd. of Review* v. *Bay Village Civil Service Comm.* (1986), 28 Ohio St. 3d 214, 217, 28 OBR 298, 302, 503 N.E. 2d 518, 521; *Kettering* v. *State Emp. Relations Bd.* (1986), 26 Ohio St. 3d 50, 60, 26 OBR 42, 51, 496 N.E. 2d 983, 991 (Locher, J., dissenting); *State, ex rel.*

*Allison,* v. *Jones* (1960), 170 Ohio St. 323, 10 O.O. 2d 417, 164 N.E. 2d 417; *State, ex rel. Petit,* v. *Wagner* (1960), 170 Ohio St. 297, 300-301, 10 O.O. 2d 344, 346, 164 N.E. 2d 574, 576-577. As Justice Wilkin stated in his concurring opinion in *Fitzgerald* v. *Cleveland* (1913), 88 Ohio St. 338, 380, 103 N.E. 512, 523: 'If all powers of municipal self-government must be subject to general laws, then clearly cities do not have home rule; they have only such powers of local self-government as the legislature of the state allows to them, and cities of Ohio will still remain under the domination of the state legislature.' " See *Ohio Assn. of Pub. School Emp., Chapter No. 471* v. *Twinsburg* (1988), 36 Ohio St. 3d 180, 182, 522 N.E. 2d 532, 534-535.

Appellees cite numerous cases from other jurisdictions in which courts have upheld the constitutionality of similar legislation in the context of the home-rule doctrine. See *Professional Fire Fighters, Inc.* v. *Los Angeles* (1963), 60 Cal. 2d 276, 32 Cal. Rptr. 830, 384 P. 2d 158; *Baggett* v. *Gates* (1982), 32 Cal. 3d 128, 185 Cal. Rptr. 232, 649 P. 2d 874; *Carofano* v. *Bridgeport* (1985), 196 Conn. 623, 495 A. 2d 1011; *Arlington* v. *Bd. of Concil. & Arbit.* (1976), 370 Mass. 769, 352 N.E. 2d 914; *Detroit Police Officers Assn.* v. *Detroit* (1974), 391 Mich. 44, 214 N.W. 2d 803; *Amsterdam* v. *Helsby* (1975), 37 N.Y. 2d 19, 332 N.E. 2d 290; *Roseburg* v. *Roseburg City Firefighters* (1981), 292 Ore. 266, 639 P. 2d 90; *Medford Firefighters Assn.* v. *Medford* (1979), 40 Ore. App. 519, 595 P. 2d 1268; *East Providence* v. *Local 850* (1976), 117 R.I. 329, 366 A. 2d 1151; *Everett* v. *Fire Fighters, Local 350* (1976), 87 Wash. 2d 572, 555 P. 2d 418. None of these states, however, has the broad home-rule powers adopted by the people of Ohio.

We next consider whether the de-

termination of wages and salaries of municipal safety employees is a matter of local self-government or is a matter of statewide concern and therefore subject to control by the General Assembly. The test to determine whether an act of a municipality is a proper exercise of the power of local self-government is found in *Cleveland Elec. Illum. Co.* v. *Painesville, supra,* at 129, 44 O.O. 2d at 123, 239 N.E. 2d at 78, quoting *Beachwood* v. *Bd. of Elections of Cuyahoga Cty.* (1958), 167 Ohio St. 369, 371, 5 O.O. 2d 6, 7-8, 148 N.E. 2d 921, 923:

" 'To determine whether legislation is such as falls within the area of local self-government, the result of such legislation or the result of the proceedings thereunder must be considered. *If the result affects only the municipality itself, with no extraterritorial effects, the subject is clearly within the power of local self-government and is a matter for the determination of the municipality.* However, if the result is not so confined it becomes a matter for the General Assembly.'

"Thus, even if there is a matter of local concern involved, if the regulation of the subject matter affects the general public of the state as a whole more than it does the local inhabitants the matter passes from what was a matter for local government to a matter of general state interest." (Emphasis added.)

Appellees cite *Kettering* v. *State Emp. Relations Bd., supra,* for the proposition that all of R.C. Chapter 4117 reaches matters of statewide concern. See, also, *id.* (Douglas, J., concurring). However, the decision in *Kettering* addressed the constitutionality of the statutory provision challenged therein, R.C. 4117.01(F)(2).

Although R.C. Chapter 4117 was enacted to reduce labor strife and to promote labor peace in the public bargaining sector, such goals do not justify interference with municipal regulation of safety forces' wages and salaries. What Rocky River pays its safety employees and how it bargains with those employees do not concern residents of other cities in Ohio just as the wages paid the safety forces of other cities do not concern residents of Rocky River. Its safety forces' wages and salaries affect only Rocky River and have no extraterritorial effects. Therefore, the subject of safety forces' wages and salaries is clearly within the power of local self-government and is a matter for determination by the municipality. "Where a municipality establishes and operates a police department, it may do so as an exercise of the powers of local self-government conferred upon it by Sections 3 and 7 of Article XVIII of the Constitution; and, if it does, the mere interest or concern of the state, which may justify the state in providing similar police protection, will not justify the state's interference with such exercise by a municipality of its powers of local self-government." *State, ex rel. Canada,* v. *Phillips, supra,* paragraph seven of the syllabus.

This court has been asked in the past, as we are now, to declare the authority of a municipality to set the wages and salaries of its employees to be a local police, sanitary or other similar regulation. We have never adopted that view and are not persuaded that we should today. This court has repeatedly found such authority to be a power of local self-government. See *State, ex rel. Mullin,* v. *Mansfield, supra; Mansfield* v. *Endly* (1931), 38 Ohio App. 528, 176 N.E. 462, affirmed (1931), 124 Ohio St. 652, 181 N.E. 886; *Benevolent Assn.* v. *Parma, supra; Teamsters Local Union No. 377* v. *Youngstown, supra; Craig* v. *Youngstown, supra; State, ex rel. Vukovich,* v. *Youngstown Civil Service Comm., supra.* Given that the author-

ity of municipalities to set wages and salaries for their employees is a power of local self-government, such power must prevail over R.C. 4117.14(I).

We therefore hold that R.C. 4117.14(I) is unconstitutional to the extent that it violates a municipality's right to exercise its powers of local self-government under Section 3, Article XVIII and Section 7, Article XVIII of the Ohio Constitution, because it interferes with the municipality's power to determine municipal safety employee compensation.

## II

The city also challenges R.C. 4117.14(I) as an unlawful delegation of municipal legislative authority. "The test for determining whether the action of a legislative body is legislative or administrative is whether the action taken is one enacting a law, ordinance or regulation, or executing or administering a law, ordinance or regulation already in existence." *Donnelly* v. *Fairview Park* (1968), 13 Ohio St. 2d 1, 42 O.O. 2d 1, 233 N.E. 2d 500, paragraph two of the syllabus. " '* * * The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' *Cincinnati, Wilmington & Zanesville RR. Co.* v. *Commrs. of Clinton County* (1852), 1 Ohio St. 77, 88. See, also, *State, ex rel. Selected Properties, Inc.,* v. *Gottfried* (1955), 163 Ohio St. 469; *L & M Investment Co.* v. *Cutler* (1932), 125 Ohio St. 12." *Peachtree Development Co.* v. *Paul* (1981), 67 Ohio St. 2d 345, 353, 21

O.O. 3d 217, 222, 423 N.E. 2d 1087, 1093.

Under Section 11, Article III of the Rocky River Charter, the city council "shall have the power to fix the salaries of its members and of all other officers and employees of the City * * *." Council then must enact ordinances establishing the salaries of city employees such as safety force members and also by ordinance establish a budget and appropriate sufficient funds to pay such salaries. Such an action clearly is a legislative function in that the council must exercise its discretion in setting salaries. R.C. 4117.14(I), however, unlawfully vests the conciliator with absolute and uncontrolled discretion to determine the wages of city safety forces employees. See *State, ex rel. Selected Properties, Inc.,* v. *Gottfried* (1955), 163 Ohio St. 469, 470, 56 O.O 397, 398, 127 N.E. 2d 371, 372. See, also, *Cincinnati* v. *Cook* (1923), 107 Ohio St. 223, 140 N.E. 655 (court held that it was unlawful to delegate to an individual powers of the municipality over use of city streets).

Other jurisdictions have reached similar conclusions. In *Erie Firefighters Local No. 293* v. *Gardner* (1962), 406 Pa. 395, 178 A. 2d 691, 695, the Pennsylvania Supreme Court affirmed based on the opinion below (1961), 26 Pa. D. & C. 2d 327, 334, which stated the following concerning delegation of municipal legislative authority to a panel of conciliators:

"If the delegation of power is to make the law, which involves a discretion of what the law shall be, then the power is nondelegable. If the conferred authority is the power or discretion to execute the law already determined and circumscribed, then the delegation is unobjectionable."[1]

---

[1] As a response to the *Erie Firefighters* decision, an amendment to Section 31, Article III, Pennsylvania Constitution, was presented to and passed by the voters in

In *Salt Lake City* v. *Internatl. Assn. of Firefighters* (Utah 1977), 563 P. 2d 786, 789-790, a case almost identical to the present case in which the city of Salt Lake City argued that the mandatory binding arbitration provisions of the state's collective bargaining law were an improper delegation of the city's legislative authority, the Utah Supreme Court, quoting Justice Levin of the Michigan Supreme Court, observed:

"* * * [T]he act authorizes the appointment of arbitrators, who are private citizens with no responsibility to the public, to make binding determinations affecting the quantity, quality, and cost of an essential public service. The legislature may not surrender its legislative authority to a body wherein the public interest is subjected to the interest of a group which may be antagonistic to the public interest. * * *

"'* * *

"'* * * The arbitrator/chairman of the panel is entrusted with the authority to decide major questions of public policy concerning the conditions of public employment, the levels and standards of public services and the allocation of public revenues. Those questions are legislative and political, not judicial or quasi-judicial. The act is structured to insulate the arbitrator/chairman's decision from review in the political process. It is not intended that he be, nor is he in fact, accountable within the political process for his decision. This is not consonant with the constitutional exercise of political power in a representative democracy.' [*Dearborn Fire Fighters Union* v. *Dearborn* (1975), 394 Mich. 229, 241-242, 231 N.W. 2d 226, 228.]

"'* * *

"'Although the old delegation doctrine has been repudiated, there remains an underlying core of validity, which requires those who have been selected, by a given process, and from a given constituency, retain the power to make ultimate policy decisions and override decisions made by others. [Footnote omitted.] The complexities of budgeting and the selection of programs, are duties elected officials owe to the electorate; these policy decisions cannot be delegated to a private ad hoc panel of arbitrators * * *.''

We agree with the observation of the Colorado Supreme Court in *Greely Police Union* v. *City Council of Greely* (1976), 191 Colo. 419, 422, 553 P. 2d 790, 792, where it stated the following:

"* * * [A] public employer cannot be forced to arbitrate disputes arising from a collective bargaining agreement.

"A contrary holding, in our view, would seriously conflict with basic tenets of representative government. Fundamental among these tenets is the precept that the officials engaged in governmental decision-making (*e.g.*, setting budgets, salaries, and other terms and conditions of public employ-

---

that state. A second sentence was added to Section 31, Article III, providing in part: "Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties * * *." See *Harney* v. *Russo* (1969), 435 Pa. 183, 187, 255 A. 2d 560, 562. Prior to amendment, Section 31, Article III contained strict anti-delegation provisions which the Pennsylvania Supreme Court in *Erie Firefighters* held prohibited binding arbitration of disputes between policemen and firemen and their public employers.

ment) must be accountable to the citizens they represent. Binding arbitration removes these decisions from the aegis of elected representatives, placing them in the hands of an outside person who has no accountability to the public."

Legal commentators have also noted the constitutional dilemma posed by requiring wage issues to be determined in binding arbitration. One commentator stated the following: "[']* * * Fixing the amount of the tax is non-delegable. To make it delegable is to turn the clock back 200 years to a time when it was claimed that our forebears, by sailing from England to America, delegated to those who remained behind the power to tax them. * * * The idea of bringing in an expert from out of town to make a final and binding decision concerning the compensation of public employees, which will necessarily fix the local tax rate, is a solution to the problem of public sector labor disputes which would cause our founding fathers not only to turn over in their graves but to attempt the miracle of resurrection from the dead.[']"[2]

In a recent symposium on the Ohio Public Employees' Collective Bargaining Act, one of the participants, Arvid Anderson, Chairman of the New York City Office of Collective Bargaining, analyzed the role of a neutral arbitrator as essentially a legislative function in which a person who knows little about local problems and the intricacies of the parties' relationship allocates public resources and determines conditions of employment.[3]

Similarly, Professor Clyde Summers, a noted commentator in the field of public-sector labor relations, clearly enunciated the reasons that arbitration should not be eagerly embraced, although it is an attractive alternative to strikes in resolving disputes with public safety employees. Although Professor Summers reluctantly supports the arbitration of wage and salary disputes between safety forces and municipal employers, he has observed as follows: (1) arbitration is wrong in principle because the decisions to be made are political decisions implicating important values. Such decisions should be made through the political process in which the voters have a choice rather than through arbitration which delegates authority to make those decisions to a person who has no political responsibility and often little political sensitivity; (2) arbitration is wrong in principle also because it enables public officials, who should be responsible, to evade their responsibility by disavowing responsibility for a tax increase when an arbitrator has granted a wage increase; (3) some arbitrators have limited competence to deal with the complicated tax and budget considerations involved in wage negotiations.[4]

The foregoing observations and our analysis of the statute cause us to conclude that R.C. 4117.14(I) vests a conciliator with the power to set wages and salaries for city safety forces employees in a manner that constitutes an unlawful delegation of legislative authority.

Appellant also argues that R.C.

---

[2] Former Dean Robert Bodeen of Marquette Law School, A Bicentennial Challenge for Taxpayer Representatives in Labor Relations, quoted in Labor Relations Law in the Public Sector (Knapp Ed. 1977) 36.

[3] Discussion: Impasse Resolution (1985), 35 Case Wes. L. Rev. 385, 388-389.

[4] Summers, Bargaining in the Government's Business: Principles and Politics (1987), 18 U. Tol. L. Rev. 265, 279-281.

4117.14(I) unconstitutionally delegates legislative authority in that it fails to "* * * establish[] a procedure whereby exercise of the [conciliator's] discretion can be reviewed effectively." *Blue Cross of N.E. Ohio* v. *Ratchford* (1980), 64 Ohio St. 2d 256, 18 O.O. 3d 450, 416 N.E. 2d 614, syllabus. R.C. 4117.14(H) provides for very limited review of the conciliator's decision: "All final offer settlement awards and orders of the conciliator * * * are subject to review by the court of common pleas having jurisdiction over the public employer as provided in Chapter 2711." As the Court of Appeals for Hamilton County observed in *Goldman* v. *Bd. of Edn.* (1965), 5 Ohio App. 2d 49, 50, 34 O.O. 2d 133, 134, 213 N.E. 2d 826, 827, under R.C. 2711.01, "* * *[o]nce the parties agree to settle a controversy by arbitration, such agreement is valid, irrevocable and enforceable except upon such grounds as exist at law for the revocation of any contract."

In *Goodyear Tire & Rubber Co.* v. *Local Union No. 200* (1975), 42 Ohio St. 2d 516, 71 O.O. 2d 509, 330 N.E. 2d 703, paragraphs one and two of the syllabus, this court held that:

"1. A mere ambiguity, in the opinion accompanying an arbitration award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for vacating the award when such award draws its essence from a collective bargaining agreement. (*United Steelworkers of America* v. *Enterprise Wheel & Car Corp.*, 363 U.S. 593, followed.)

"2. R.C. 2711.10 limits judicial review of arbitration to claims of fraud, corruption, misconduct, an imperfect award, or that the arbitrator exceeded his authority."

Given the statutory and judicial presumption of correctness afforded an arbitrator's decision, the very limited nature of the judicial review provided by R.C. 4117.14(I) cannot be deemed to be an effective review of an arbitrator's decision when weighed against a charter municipality's power of self-government.

Appellant also argues that R.C. 4117.14(I) unconstitutionally delegates the municipality's legislative power because the standards which the conciliator must follow are not sufficiently specific to limit the conciliator's discretion. Although a number of criteria are listed in R.C. 4117.14(G)(7), the conciliator still retains considerable discretion. R.C. 4117.14(G) provides, in pertinent part:

"(7) After hearing, the conciliator shall resolve the dispute between the parties by selecting, on an issue-by-issue basis, from between each of the party's final settlement offers, taking into consideration the following:

"(a) Past collectively bargained agreements, if any, between the parties;

"(b) Comparison of the issues submitted to final offer settlement relative to the employees in the bargaining unit involved with those issues related to other public and private employees doing comparable work, giving consideration to factors peculiar to the area and classification involved;

"(c) the interests and welfare of the public, the ability of the public employer to finance and administer the issues proposed, and the effect of the adjustments on the normal standard of public service;

"(d) The lawful authority of the public employer;

"(e) The stipulations of the parties;

"(f) Such other factors, not confined to those listed in this section, which are normally or traditionally taken into consideration in the deter-

mination of the issues submitted to final offer settlement through voluntary collective bargaining, mediation, fact-finding, or other impasse resolution procedures in the public service or in private employment."

The court of appeals cited *Strain* v. *Southerton* (1947), 148 Ohio St. 153, 35 O.O. 167, 74 N.E. 2d 69, in support of its conclusion that R.C. 4117.14(G) provides sufficiently specific standards for the conciliator. In *Strain,* however, unlike the present case, the statute provided for full review of decisions for errors of law. Similarly, *Cleveland Police Patrolmen's Assn.* v. *Cleveland* (1985), 24 Ohio App. 3d 16, 17, 20, 24 OBR 38, 39, 42, 492 N.E. 2d 861, 863, 865-866, cited by the court of appeals in its decision and by appellees here, is inapposite. In *Cleveland Police Patrolmen's Assn.,* the award issued by the arbitrator was required to be reviewed by Cleveland City Council and then adopted by municipal ordinance in order to be effective. In the present case, as discussed above, generally the city council must accept the conciliator's decision. Only limited judicial review is available.

Given that the authority to set safety forces' salaries is a legislative function, we hold that R.C. 4117.14(I) is unconstitutional as it unlawfully delegates municipal legislative authority by mandating binding arbitration for collective bargaining disputes over municipal safety employee benefits and wages.

### III

Appellees and the dissent vigorously argue that R.C. Chapter 4117 concerns the general welfare of employees and, pursuant to Section 34, Article II of the Ohio Constitution, prevails over conflicting municipal charter provisions and ordinances. We do not agree.

Section 34, Article II reads as follows:

"Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power."

Section 34 was adopted in 1912 so that regulation of working hours and minimum wages would be permissible under the Constitution. See 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 1328-1338, 1784-1786. "MR. CRITES: * * * First, you will note that this proposal is for the sole purpose of limiting the number of hours of labor; second, to establish a minimum wage for the wageworker." *Id.* at 1331.

Although Section 34 was adopted as part of the present Constitution governing the state of Ohio, this court has never held that state laws, arguably enacted pursuant to Section 34, preempt the power of a municipality to determine the wages of its employees. See *State, ex rel. Mullin,* v. *Mansfield, supra; Mansfield* v. *Endly, supra; Benevolent Assn.* v. *Parma, supra; Teamsters Local Union No. 377* v. *Youngstown, supra; Craig* v. *Youngstown, supra; State, ex rel. Vukovich,* v. *Youngstown Civil Service Comm., supra.*

This court, with only one exception, has recognized the limited effect of this constitutional provision by generally applying it only in cases directly or indirectly involving hours and minimum wages. In fact, a review of the opinions of this court indicates that Section 34, Article II has apparently never been argued, and certainly never been used, as a basis upon which to declare that the authority of a municipality to bargain with its

employees is not an element of its home-rule powers.

In *State* v. *Kidd* (1958), 167 Ohio St. 521, 5 O.O. 2d 202, 150 N.E. 2d 413, we held that a legislative enactment providing for the Sunday closing of businesses is permitted under the express provisions of Section 34, Article II. Similarly, *Strain* v. *Southerton, supra,* recognized the General Assembly's express authority under Section 34, Article II to enact legislation regarding minimum wages. See, also, *State, ex rel. Evans,* v. *Moore* (1982), 69 Ohio St. 2d 88, 23 O.O. 3d 145, 431 N.E. 2d 311 (court did not apply Section 34, Article II in holding that the state prevailing wage law preempts and supersedes any local ordinance to the contrary); *Craig* v. *Youngstown* (1954), 162 Ohio St. 215, 55 O.O. 110, 123 N.E. 2d 19 (court rejected application of Section 34, Article II, and held that the state prevailing wage law did not apply to employees of a home-rule municipality working on a public improvement project for the municipality).

*State, ex rel. Bd. of Trustees of Pension Fund,* v. *Bd. of Trustees of Relief Fund* (1967), 12 Ohio St. 2d 105, 41 O.O. 2d 410, 233 N.E. 2d 135, has been cited as authority for appellees' position. That case is not dispositive of the issue in this case for two reasons. First, the court in *State, ex rel. Bd. of Trustees of Pension Fund, supra,* based its decision on its conclusion that local government employees are employees for purposes of Section 34, Article II. That fact is not in contention in this case. The question here is the extent of the state's authority vis-a-vis a charter municipality's authority in the setting of wages and benefits. A reading of the briefs in *State, ex rel. Bd. of Trustees of Pension Fund, supra,* helps clarify the terse opinion and the issue that was considered by

this court in that case. At issue was the question of whether the city of Martins Ferry, a non-charter city, was required to transfer the assets of its Police Relief and Pension Fund to the state Police and Firemen's Disability and Pension Fund pursuant to R.C. Chapter 742.

In arguing that the fund should be transferred, the state admitted in its brief that "[t]he appointment and pay of a police officer or fireman is not an exercise of the police power but is clearly a matter of local self-government," citing *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 5 O.O. 2d 481, 151 N.E. 2d 722. The state further conceded that municipal authorities have the power to set the wages and benefits of their employees. The court's opinion does not discuss that issue but holds that legislation providing for the centralized state administration of local contributions to the police and firemen's pension funds does not violate Section 34, Article II.

That holding does not support the proposition essentially asserted by appellees here that the General Assembly may mandate that charter municipalities do not have the authority to set the amount of wages and benefits of their employees.

The brief history of the police and firemen's pension funds is also helpful in understanding the issue decided by the court in *State, ex rel. Bd. of Trustees of Pension Fund:*

"In spite of their long history, * * * [a] majority of * * * locally administered funds found themselves in a very unhealthy financial situation by the 1960's. Some systems were already in a state tantamount to bankruptcy, while many others were well on their way toward the same crisis. An awareness of this fact led the 105th General Assembly to authorize a study of the problem by a legislative committee.

This committee's report led to the enactment, by the 106th General Assembly, of legislation creating the Police and Firemen's Disability and Pension Fund. *The purpose of this legislation was simply to provide for central administration of an already existing program, so as to assure, with the assistance of necessary actuarial data, competent and efficient administration which often did not exist locally.* In this regard the General Assembly's model was the Public Employees Retirement System which, through centralized administration of local contributions, was already providing all other municipal employees with the benefits which flow from a competently administered retirement system." (Emphasis added.) (*State, ex rel. Bd. of Trustees of Pension Fund, supra,* intervening relator's brief, at 3.)

The legislative creation of a system for the central administration of pension funds was prompted by the "statewide" interest in assuring that funds would be available to support pension and disability retirement payments to those who enforce our local laws and protect our life and property. (*State, ex rel. Bd. of Trustees of Pension Fund, supra,* relator's brief, at 5.)

Even assuming the holding in *State, ex rel. Bd. of Trustees of Pension Fund* could be applied to a charter municipality, the state interest in providing a solvent pension fund for all safety forces is clearly distinguishable from the alleged state interest in the wages provided the safety forces in each municipality. A pension fund requires a fixed contribution from all those who would benefit from the fund. Without its statewide plan for the setting and management of contributions, some local funds would be, as they apparently were in 1967, in danger of being insolvent or at least unable to pay the benefits promised. The "interest" that produced the statewide pension fund held to be constitutional in *State, ex rel. Bd. of Trustees of Pension Fund* simply cannot produce a constitutional basis for replacing a city's authority to set wages and benefits with an unelected, unaccountable arbitrator.

In short, if we were to adopt the argument of appellees and the argument presented in the dissent, we would be required to overrule years of well-established law in Ohio, adopt an argument in doing so that has not been made previously with respect to the setting of wages and related benefits, and adopt an argument that, in effect, would strip all incorporated municipalities in Ohio of one of their most important responsibilities and duties to their citizens — the determination and establishment of the wages and benefits of their public employees and the concomitant duty to adopt a budget. The history, the words and the application of Section 34, Article II of the Ohio Constitution simply do not persuade us that we are required to or that we should use that provision of the Constitution to relieve virtually every locally elected city council and city commission in this state of that duty.

In declaring R.C. 4117.14 unconstitutional to the extent that it imposes binding arbitration upon charter municipalities, we are mindful of the policy arguments raised in support of constitutionality. However, our holding here leaves intact most of the provisions of the Act that are intended to bring about the peaceful resolution of public-sector labor-management bargaining issues. Specifically, the parties may, pursuant to R.C. 4117.14(C), voluntarily participate in nonbinding arbitration, enlist the aid of a neutral fact-finder, submit their disputes for settlement by a three-member citizen

conciliation council, or use any of the dispute-settlement procedures mutually agreed to by the parties. The parties may also seek assistance from the State Employment Relations Board which can appoint a mediator to assist the parties in the collective bargaining process and, if an impasse is reached, appoint a fact-finding panel to gather facts and make recommendations for resolution of unresolved issues. R.C. 4117.14(C)(2) through (6).

Furthermore, notwithstanding our holding herein, the procedures defined in R.C. 4117.14(D) through (G) remain effective to the extent that the procedures may not produce binding awards by third parties.

To the extent that R.C. 4117.09 provides for enforcement of "an award" by an arbitrator, said provision is declared to be invalid. To the extent that the use of the word "award" in R.C. 4117.14 is inconsistent with our holding herein, the word "award" is deemed to have no effect.

R.C. 4117.14(H) is invalid in view of our holding herein.

For the foregoing reasons, the judgment of the court of appeals is reversed and final judgment is granted for appellant.

*Judgment reversed.*

LOCHER, HOLMES and WRIGHT, JJ., concur.

SWEENEY, DOUGLAS and H. BROWN, JJ., dissent.

WRIGHT, J., concurring. I must stress that the popularity of a legislative enactment is, irrelevant in the face of a clear-cut, constitutional mandate. Justice Douglas correctly observes that it is incongruous to treat one segment of our safety forces one way and the rest the other. However, this court did not draft the Ohio Constitution. Likewise, we have no right to amend it. Accordingly, I must join in the constitutional analysis propounded by Chief Justice Moyer despite my reservations concerning the result.

The most charitable thing I can say concerning the dissent's seemingly prolix treatment of the issues of *stare decisis* and home rule is the ancient but accurate statement that "[t]hy wish was father * * * to that thought." Shakespeare, King Henry IV, Part II, Act IV, Scene 5.

SWEENEY, J., dissenting. In my view, the majority's position herein is wholly untenable, especially since it usurps the power of the General Assembly in a manner heretofore unknown in Ohio jurisprudence. In addition to the excellent analysis and well-reasoned points set forth in Justice Douglas' dissent, I wish to add a few of my own observations.

The majority's attempt to render superfluous the clear and unambiguous language of Section 34, Article II of the Ohio Constitution is judicially unsound. Even if it were to be assumed, *arguendo,* that the framers intended that this constitutional provision pertain only to hours of labor and minimum wage, the realities of modern society and labor relations demand a more coherent and thoughtful analysis of this constitutional mandate. Carried to its logical extreme, the majority's mechanical constitutional analysis would justify limiting suffrage to white, male landowners since that is what was originally intended by the framers. Certainly no reasonable individual in today's society advocates such a position. However, the majority's fallacious attempt to limit constitutional interpretation to the sole inquiry of what the framers intended demands such an absurd result.

Stripped to its bare essentials, the majority arrives at its position because

it apparently believes that R.C. 4117.14(I) is an unwise enactment. Nevertheless, it must be emphasized, as some in the majority have repeatedly asserted, that this court shall not question the wisdom of legislation; it may only question the constitutionality of legislation. See, *e.g., Mominee* v. *Scherbarth* (1986), 28 Ohio St. 3d 270, at 295, 28 OBR 346, at 368, 503 N.E. 2d 717, at 736 (Wright, J., dissenting).

By enacting R.C. 4117.14, the General Assembly has determined that while police and fire fighters should not have the right to strike, they should have the right to bargain collectively. The majority, however, usurps this legislative determination under the guise of municipal home rule. Such a judicial usurpation of legislative power is not permitted under the Ohio Constitution, and for this reason, I cannot help but conclude that the majority opinion itself is an unsound decision. Based on these reasons, as well as the reasons so cogently articulated by Justice Douglas, I would affirm the judgment of the court of appeals below.

DOUGLAS, J., dissenting. The specific issue presented here is whether R.C. 4117.14(I) is unconstitutional either because it divests munici-palities of essential powers of self-government, or because it unlawfully delegates municipal legislative authority. I believe that R.C. 4117.14(I) passes muster on both counts.

I dissent to today's decision at some length because, in my judgment, the majority opinion flouts the law, violates public policy and defies logic so completely that a vigorous and thorough response is essential.

## I
## The Facts

The facts of this case are undisputed. Appellee, Rocky River Firefighters Association, Local 695, is the exclusive representative of fire fighters employed by appellant, the city of Rocky River. In 1984, appellant and appellee commenced negotiations for the first collectively bargained employment contract between appellant and appellee's members. When the parties failed to reach an agreement, they requested mediation assistance from appellee State Employment Relations Board ("SERB") pursuant to R.C. 4117.14(C)(2).[5] The mediation process failed to resolve the parties' disagreement on numerous issues, so the parties proceeded to the next step: submission of the issues to a fact-finding panel under R.C. 4117.14(C)(3).[6] The

---

[5] R.C. 4117.14(C)(2) provides:

"If, fifty days before the expiration date of the collective bargaining agreement, the parties are unable to reach an agreement, any party may request the state employment relations board to intervene. The request shall set forth the names and addresses of the parties, the issues involved, and, if applicable, the expiration date of any agreement.

"The board shall intervene and investigate the dispute to determine whether the parties have engaged in collective bargaining.

"If an impasse exists or forty-five days before the expiration date of the collective bargaining agreement if one exists, the board shall appoint a mediator to assist the parties in the collective bargaining process."

[6] R.C. 4117.14(C)(3) states:

"If the mediator after assisting the parties advises the board that the parties have reached an impasse, or not later than thirty-one days prior to the expiration date of the agreement, the board shall appoint within one day a fact-finding panel of not more than three members who have been selected by the parties in accordance with rules established by the board, from a list of qualified persons maintained by the board."

panel held a hearing and issued recommendations favoring appellant's positions on all disputed issues except salary, on which appellee fire fighters' proposal was recommended. Appellant exercised its option under R.C. 4117.14(C)(6)[7] to reject the panel's recommendation. This rejection triggered the conciliation requirements of R.C. 4117.14(D)(1).[8] After hearing testimony from the parties, the conciliator issued an order choosing appellee's final salary offer over the offer of appellant. Appellant refused to recognize the validity of this order, and commenced the instant action seeking a declaration that R.C. 4117.14(I) violates the Ohio Constitution by mandating binding arbitration between a city and its safety forces in the event of a collective bargaining impasse. The court of common pleas granted appellee's motion for summary judgment, upholding the constitutionality of R.C. 4117.14(I). The court of appeals, in a well-reasoned and unanimous opinion authored by Markus, C.J., affirmed.

## II
## The Law

Today's majority opinion, to my deep dismay, reverses the well-reasoned judgments of the trial court and the court of appeals and strikes down the mandatory binding arbitration provision of R.C. 4117.14(I). This decision is not only unfair — it is also profoundly misguided. It distorts the Constitution of this state, misstates or ignores applicable case law, disregards longstanding principles of statutory construction and, as authority for the propositions propounded, cites cases that (with one exception) were all decided before 1984, when the General Assembly first spoke on the issue of public employee collective bargaining.

## A
## Presumption of Constitutionality

In reaching its conclusion that

---

[7] R.C. 4117.14(C)(6) reads as follows:

"Not later than seven days after the findings and recommendations are sent, the legislative body, by a five-fifths vote of its total membership, and in the case of the public employee organization, the membership, by a three-fifths vote of the total membership, may reject the recommendations; if neither rejects the recommendations, the recommendations shall be deemed agreed upon as the final resolution of the issues submitted and a collective bargaining agreement shall be executed between the parties, including the fact-finding panel's recommendations, except as otherwise modified by the parties by mutual agreement. If either the legislative body or the public employee organization rejects the recommendations, the board shall publicize the findings of fact and recommendations of the fact-finding panel. The board shall adopt rules governing the procedures and methods for public employees to vote on the recommendations of the fact-finding panel."

[8] R.C. 4117.14(D)(1) provides in pertinent part:

"Public employees, who are members of a police or fire department * * * shall submit the matter to a final offer settlement procedure pursuant to a board order issued forthwith to the parties to settle by a conciliator selected by the parties. The parties shall request from the board a list of five qualified conciliators and the parties shall select a single conciliator from the list by alternate striking of names. If the parties cannot agree upon a conciliator within five days after the board order, the board shall on the sixth day after its order appoint a conciliator from a list of qualified persons maintained by the board or shall request a list of qualified conciliators from the American arbitration association and appoint therefrom."

R.C. 4117.14(I) must fall, the majority flouts the long-established principle requiring courts to presume the constitutionality of legislative enactments. *State, ex rel. Jackman,* v. *Court of Common Pleas* (1967), 9 Ohio St. 2d 159, 161-162, 38 O.O. 2d 404, 405, 224 N.E. 2d 906, 909. This presumption can only be overcome by proof, *beyond a reasonable doubt,* that the legislation and the Constitution are clearly incompatible. *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E. 2d 59, paragraph one of the syllabus. In my view, appellant has not sustained this heavy burden.

B
The Ohio Constitution: Home Rule

Appellant brings this appeal under the aegis and guise of the home-rule provisions of the Ohio Constitution. For the reasons that follow, the home-rule sections do not apply and, therefore, this is not a "home-rule" case at all.

Section 3, Article XVIII of the Ohio Constitution provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, *as are not in conflict with general laws.*" (Emphasis added.)

This court has already determined that "[t]he collective bargaining law of the state of Ohio is a law of a general nature. * * *" *State, ex rel. Dayton Fraternal Order of Police Lodge No. 44,* v. *State Emp. Relations Bd.* (1986), 22 Ohio St. 3d 1, 22 OBR 1, 488 N.E. 2d 181, paragraph one of the syllabus. Section 3, Article XVIII *explicitly withholds* from municipalities the authority to exercise powers or adopt regulations which are in conflict with "general laws." The home-rule amendment, Section 7, Article XVIII, grants municipalities powers of home rule *"subject to the provisions of section 3 of this article * * *."* (Emphasis added.) Therefore, the power of home rule is constitutionally limited to powers not in conflict with "general laws."[9] As noted above, R.C. Chapter 4117 has been held to be a law of general nature.

---

[9] But, see, *State, ex rel. Canada,* v. *Phillips* (1958), 168 Ohio St. 191, 5 O.O. 2d 481, 151 N.E. 2d 722, paragraph four of the syllabus, which, however, needs to be read in context with the issues involved in that case. *Canada* is a case involving civil service and concerns Section 10, Article XV of the Ohio Constitution. It does not deal in any way with Section 34, Article II, which is so central to the case before us today. In any event, it is my belief that *Canada* was wrongly decided and should be overruled, just as the *Canada* court overruled so many other decisions to arrive at its tortured conclusion. My reading of Section 3, Article XVIII does not support the *Canada* court's holding that the phrase "as are not in conflict with general laws" modifies only the phrase "local police, sanitary and other similar regulations." A review of the con-

stitutional debates concerning Section 3, Article XVIII reveals that the narrow interpretation adopted by the *Canada* court is unwarranted. Mr. George W. Knight, a convention delegate and a chief proponent of the amendment, characterized its purpose as follows: "[T]his proposal undertakes * * * to provide that municipalities shall have the power to do those things which are not prohibited, that is, those things with reference to local government, with reference to the affairs which concern the municipality, which are not forbidden by the lawmaking power of the state, or are not in conflict with the general laws of the state under the police power and the general state regulation. * * *" 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 1433. Obviously, this characterization of

Thus, today's majority fails to recognize the simple fact that appellant does not possess *any* constitutional powers of "home rule" in the context of public employee collective bargaining. The only authority enjoyed by municipalities in this area is that expressly conferred by the Act, which authority, I might add, is quite substantial. See R.C. 4117.08(C).[10]

Additionally, R.C. Chapter 4117 was enacted by the General Assembly in the exercise of its police power. The police power "encompasses regulation designed to promote public convenience or the general prosperity or welfare." *Columbus* v. *Teater* (1978), 53 Ohio St. 2d 253, 257, 7 O.O. 3d 410, 412, 374 N.E. 2d 154, 157, fn. 2. "Undeniably, the General Assembly was exercising its police power to promote the general safety and welfare in enacting the Public Employees Collective Bargaining Act." *Kettering* v. *State Emp. Relations Bd.* (1986), 26

Ohio St. 3d 50, 55, 26 OBR 42, 46, 496 N.E. 2d 983, 987. Legislation enacted pursuant to the police power prevails over laws of a municipality adopted in the exercise of its powers of local self-government. *Canton* v. *Whitman* (1975), 44 Ohio St. 2d 62, 73 O.O. 2d 285, 337 N.E. 2d 766, paragraph two of the syllabus. Further, Justice Holmes, writing for the majority in *Weir* v. *Rimmelin* (1984), 15 Ohio St. 3d 55, 15 OBR 151, 472 N.E. 2d 341, stated: "[T]he [Home Rule] [A]mendment does not provide cities the absolute power of local self-government. * * * [Citations omitted.] Where the General Assembly has enacted legislation pursuant to the state's police power which governs a statewide concern, the statute takes precedence over ordinances enacted under the home rule authority of municipalities. * * *" *Id.* at 56, 15 OBR at 152, 472 N.E. 2d at 343. The Public Employees' Collective Bargaining Act, therefore,

---

Section 3, Article XVIII is totally inconsistent with the interpretation espoused by the *Canada* court.

[10] R.C. 4117.08(C) provides in pertinent part:

"Unless a public employer agrees otherwise in a collective bargaining agreement, nothing in Chapter 4117. of the Revised Code impairs the right and responsibility of each public employer to:

"(1) Determine matters of inherent managerial policy which include, but are not limited to areas of discretion or policy such as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, and organizational structure;

"(2) Direct, supervise, evaluate, or hire employees;

"(3) Maintain and improve the efficiency and effectiveness of governmental operations;

"(4) Determine the overall methods, process, means, or personnel by which

governmental operations are to be conducted;

"(5) Suspend, discipline, demote, or discharge for just cause, or lay off, transfer, assign, schedule, promote, or retain employees;

"(6) Determine the adequacy of the work force;

"(7) Determine the overall mission of the public employer as a unit of government;

"(8) Effectively manage the work force;

"(9) Take actions to carry out the mission of the public employer as a governmental unit.

"The employer is not required to bargain on subjects reserved to the management and direction of the governmental unit except as affect wages, hours, terms and conditions of employment, and the continuation, modification, or deletion of an existing provision of a collective bargaining agreement. * * *"

supersedes conflicting laws of a municipality, such as the charter provision under scrutiny herein.

Furthermore, by its holding today, the majority once again casts this state into its former role as a sort of judicial Cro-Magnon man. In other states having home-rule provisions which have considered the question, the states' highest courts have upheld statewide regulation of collective bargaining against home-rule attacks. *Carofano* v. *Bridgeport* (1985), 196 Conn. 623, 495 A. 2d 1011; *Roseburg* v. *Roseburg City Firefighters, Local No. 1489* (1981), 292 Ore. 266, 639 P. 2d 90; *Everett* v. *Fire Fighters, Local No. 350* (1976), 87 Wash. 2d 572, 555 P. 2d 418; *East Providence* v. *Local 850, Internatl. Assn. of Firefighters* (1976), 117 R.I. 329, 366 A. 2d 1151; *Arlington* v. *Bd. of Concil. and Arbit.* (1976), 370 Mass. 769, 352 N.E. 2d 914; *Amsterdam* v. *Helsby* (1975), 37 N.Y. 2d 19, 332 N.E. 2d 290; *Detroit Police Officers Assn.* v. *Detroit* (1974), 391 Mich. 44, 214 N.W. 2d 803; *Professional Fire Fighters, Inc.* v. *Los Angeles* (1963), 60 Cal. 2d 276, 32 Cal. Rptr. 830, 384 P. 2d 158.

The majority simply dismisses these cases by stating that "[n]one of these states * * * has the broad home-rule powers adopted by the people of Ohio." However, what are the true facts? What does a review of these cases *really* show? Consider, as an example, the following statement by the Connecticut Supreme Court in *Carofano, supra*: " 'Our constitutional home rule provision * * * prohibits the legislature from encroaching on the local authority to regulate matters of purely local concern, such as the organization of local government or local budgetary policy.' " *Id.* at 630, 495 A. 2d at 1015. In the *Detroit* case, *supra,* the Michigan Supreme Court declared that "* * * Michigan is a strong home rule state with basic local authority." *Id.* at 66, 214 N.W. 2d at 814. These states obviously share the "broad home-rule powers" which the majority seems to believe are exclusive to Ohio. Further statements from these cases reveal the strong similarities between their home-rule jurisprudence and that of Ohio. For example, in *Professional Fire Fighters, Inc., supra,* the California Supreme Court asserted that there are innumerable authorities, holding that "* * * general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern." *Id.* at 292, 32 Cal. Rptr. at 840, 384 P. 2d at 169. This rule is virtually identical to the Ohio rule as espoused in a multitude of decisions, including *Columbus* v. *Teater, supra; Weir* v. *Rimmelin, supra;* and *State, ex rel. Adkins,* v. *Sobb* (1986), 26 Ohio St. 3d 46, 26 OBR 39, 496 N.E. 2d 994. Evidently, the home-rule jurisprudence of these states resembles Ohio's much more than the majority cares to admit.

Today's majority decision is not only out of step with holdings from other states, it is also inconsistent with recent case law emanating from this court. The majority should be reminded that this court has already decided that R.C. Chapter 4117, which has as its purpose the promotion of stability and clarity in employer-employee relations in the public sector, is a matter of statewide concern. *Kettering* v. *State Emp. Relations Bd., supra,* at 55, 26 OBR at 46, 496 N.E. 2d at 987. The General Assembly, in enacting this chapter, manifested a statewide concern for the stability of such relations due to the proliferation of public employee strikes that had besieged Ohio under the former Ferguson Act. It is axiomatic that

where the subject matter of a statute is of statewide concern, the statute takes precedence over conflicting local laws. See, *e.g., State, ex rel. Evans,* v. *Moore* (1982), 69 Ohio St. 2d 88, 23 O.O. 3d 145, 431 N.E. 2d 311. Appellant maintains that its charter provision, which reserves to the city the power to fix employee salaries, takes precedence over R.C. 4117.14(I) since the setting of employee wages is fundamentally a local concern. This argument boasts a certain superficial appeal. But the fact remains that the charter provision conflicts in this narrow instance with R.C. Chapter 4117, which has already been deemed a matter of statewide concern. R.C. 4117.14(I) binds the city to the conciliator's finding. Under the statewide concern doctrine, the statute must prevail.

The majority opinion relies on this court's holding in *Northern Ohio Patrolmen's Benevolent Assn.* v. *Parma* (1980), 61 Ohio St. 2d 375, 15 O.O. 3d 450, 402 N.E. 2d 519, for the proposition that the wages a municipality pays to its employees are a matter of purely local concern which must prevail over a general law. However, the *Parma* case contains no authority whatsoever for the application of such a proposition to the case before us today. The *Parma* case is distinguishable in every important particular.

First and foremost, the *Parma* case pre-dates the enactment of R.C. Chapter 4117. The General Assembly had not yet spoken on the issue of public employee collective bargaining. The statewide concern addressed by the legislature in its passage of the Act was obviously not at issue in the *Parma* case. Instead, the *Parma* decision involved R.C. 5923.05, which required that cities pay their employees who are on military leave of absence their full salaries for a maximum of thirty-one days every calendar year irrespective

of the compensation paid to such employees by the military. The city of Parma had passed an ordinance which provided that the city would pay such employees only the difference between the employees' city salary and the compensation from the military. The *Parma* court held that the state statute could not prevail over the conflicting municipal ordinance because "[t]he *state's concern in this matter is not sufficient* to interfere with the municipali-[ty's] fiscal decision as to wages paid to its employees." (Emphasis added.) *Id.* at 383, 15 O.O. 3d at 456, 402 N.E. 2d at 525.

Thus, the particular state interest manifested in R.C. 5923.05 was deemed inadequate to override the particular interest of the municipality as reflected in its ordinance. In no way can the *Parma* decision be interpreted as support for a proposition that a municipality's interest in the area of wages for its employees is always paramount. The *Parma* court decided only that, *under the facts of that case,* the state's interest was insufficient. The obvious implication is that had the state's interest been greater, the ordinance would have fallen. Clearly, the state's interest as expressed in R.C. Chapter 4117 is considerably more compelling than the interest addressed by R.C. 5923.05. Thus, to decide the case before us today on the basis of *Parma* makes no sense at all.

Moreover, the *Parma* court cited the fact that the state had at its disposal "many other viable alternatives to induce enlistment and maintenance of the armed reserves rather than further saddling the municipalities with an additional expense." *Id.* at 383, 15 O.O. 3d at 456, 402 N.E. 2d at 525. No such alternatives exist in the present case.

Finally, the majority holds that R.C. 4117.14(I) constitutes an imper-

missible delegation of municipal legislative authority to the conciliator. This argument must also fail. In *Blue Cross of N.E. Ohio* v. *Ratchford* (1980), 64 Ohio St. 2d 256, 18 O.O. 3d 450, 416 N.E. 2d 614, a case which the majority cites but completely misinterprets, this court held:

"A statute does not unconstitutionally delegate legislative power if it establishes, through legislative policy and such standards as are practical, an intelligible principle to which the administrative officer or body must conform and further establishes a procedure whereby exercise of the discretion can be reviewed effectively." *Id.* at syllabus.

It can readily be seen that R.C. 4117.14 does not unconstitutionally delegate legislative power within the meaning of *Ratchford.* A review of the statute reveals that it provides the conciliator with detailed guidelines under which to proceed. R.C. 4117.14(G)(7) provides as follows:

"After hearing, the conciliator shall resolve the dispute between the parties by selecting, on an issue-by-issue basis, from between each of the party's final settlement offers, taking into consideration the following:

"(a) Past collectively bargained agreements, if any, between the parties;

"(b) Comparison of the issues submitted to final offer settlement relative to the employees in the bargaining unit involved with those issues related to other public and private employees doing comparable work, giving consideration to factors peculiar to the area and classification involved;

"(c) *The interests and welfare of the public, the ability of the public employer to finance and administer the issues proposed,* and the effect of the adjustments on the normal standard of public service;

"(d) The lawful authority of the public employer;

"(e) The stipulations of the parties;

"(f) Such other factors, not confined to those listed in this section, which are normally or traditionally taken into consideration in the determination of the issues submitted to final offer settlement through voluntary collective bargaining, mediation, fact-finding, or other impasse resolution procedures in the public service or in private employment." (Emphasis added.)

It is difficult to conceive how the General Assembly could have formulated more "practical" standards or a more "intelligible principle" within the meaning of *Ratchford, supra,* particularly given the purpose of the Act, which is to "promot[e] orderly and constructive relationships between all public employers and their employees." R.C. 4117.22. Finally, after all this, the decision of the conciliator is expressly made subject to judicial review under R.C. Chapter 2711. R.C. 4117.14(H).

### C
### The Ohio Constitution:
### Section 34, Article II

The analysis of the law of this state regarding home rule, discussed in subpart II A, *supra,* is provided for the sole purpose of countering the inaccuracies and distortions advanced by the majority. In actuality, it is my considered judgment that this case does not present a home-rule question in any shape or form. This conclusion is absolutely compelled by the express and unequivocal language of Section 34, Article II of the Ohio Constitution. That section provides:

"Laws may be passed fixing and

regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; *and no other provision of the constitution shall impair or limit this power."* (Emphasis added.)

This provision constitutes a broad grant of authority to the legislature to provide for the welfare of all working persons, including local safety forces. *State, ex rel. Bd. of Trustees of Pension Fund,* v. *Bd. of Trustees of Relief Fund* (1967), 12 Ohio St. 2d 105, 41 O.O. 2d 410, 233 N.E. 2d 135. The provision expressly states in "clear, certain and unambiguous language" that *no other provision* of the Constitution may impair the legislature's power under Section 34. *Id.* at 107, 41 O.O. 2d at 412, 233 N.E. 2d at 137. This prohibition, of course, includes the "home-rule" provision contained in Section 3, Article XVIII. *Id.* at 106, 41 O.O. 2d at 411, 233 N.E. 2d at 137. How does the majority get around the specific language of this decision? The majority simply ignores the existence and importance of the holding. The lead opinion refers to the *Pension Fund* case only in passing, citing it as authority for the proposition that Section 34 has only been applied by this court in cases "* * * directly or indirectly involving hours and minimum wages." The majority must be aware that the issue of pensions has absolutely *nothing* to do with hours of labor or the minimum wage.

R.C. Chapter 4117, the Public Employees' Collective Bargaining Act, is indisputably concerned with the "general welfare" of employees. Therefore, pursuant to Section 34, Article II, the power of the General Assembly to adopt the Act *may not be affected in any way by the "home-rule" amendment.* The majority's insistence that R.C. 4117.14(I) is unconstitutional for violation of Sections 3 and 7, Article XVIII of the Ohio Constitution cannot withstand scrutiny. The binding arbitration provision of R.C. Chapter 4117 is a valid exercise of the legislative function under Section 34, Article II.

It is argued by the majority that Section 34 has no application to the conciliation statute before us today, since Section 34 was intended to apply only to matters involving hours of labor and the minimum wage. In alleged support of this proposition, the majority cites the debates on Section 34 which occurred when the proposal was presented to the 1912 constitutional convention for consideration. The majority implies that since the "entire" debate concerned only the minimum wage and hours provisions, and since there were statements during the debate that the section's principal aims were to establish a minimum wage and to limit the hours of labor, judicial interpretation of Section 34 should be limited accordingly. This argument is, at best, misguided and, at worst, dishonest.

First, it should be noted that the words of Mr. H. M. Crites, quoted by the majority, are actually taken from Crites' argument *against* the adoption of Section 34. Crites was an outspoken critic and vigorous opponent of the amendment, and his characterization of the amendment can hardly be cited as authority for its meaning. His description of the purpose of Section 34 cannot be equated with the sentiments of those who voted to submit the amendment in the form in which it was eventually passed.

Second, the fact that statements were made during the debate that the *principal* purpose of Section 34 was to enable the state to establish a minimum wage and to regulate hours of employment does not signify that such was its *only* purpose. In fact, other

statements made during the debate, entitled to equal weight, indicate that the section's purpose was much broader. For example, Dennis Dwyer, a convention delegate and an ardent proponent of the measure, stated that Section 34 was designed to promote "* * * fair living wages, good sanitary surroundings during hours of labor, protection as far as possible against danger, a fair working day." 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 1332.

Third, the language of Section 34 is so clear and unequivocal that resort to secondary sources, such as the constitutional debates, is actually unnecessary. Where the language of a statute or constitutional provision is clear and unambiguous, it is the duty of courts to enforce the provision as written. *Bernardini* v. *Bd. of Edn.* (1979), 58 Ohio St. 2d 1, 12 O.O. 3d 1, 387 N.E. 2d 1222. "Debates of a constitutional convention are proper matter for consideration where they throw light on the correct interpretation of any provision of the Constitution, but if the provision is clear and may be read without interpretation, the discussion leading to its adoption is of no value, nor are the various statements by the members of the convention and the resolutions offered during the convention determinative of the meaning of the amendment." *State, ex rel. Harbage*, v. *Ferguson* (1941), 68 Ohio App. 189, 22 O.O. 139, 36 N.E. 2d 500, paragraph one of the headnotes, appeal dismissed (1941), 138 Ohio St. 617, 22 O.O. 152, 37 N.E. 2d 544.

Regardless of what was said or not said during the debates, the unalterable fact remains that Section 34, as it was ultimately adopted, transcends the limitations urged by appellant. If the framers of our Constitution had intended this section to apply only to the minimum wage, almost half of the forty-one words contained in this section must be regarded as mere surplusage, since it further provides that laws may be passed "fixing and regulating the hours of labor * * * and providing for the comfort, health, safety and general welfare of all employes * * *." Are we to believe, as the majority apparently does, that these words were not intended to have meaning? To ask the question is to answer it.

The same may be said of the final phrase of Section 34, which states that "* * * no other provision of the constitution shall impair or limit" the General Assembly's power to pass laws concerning the welfare of employees.[11] How can it be seriously maintained that the home-rule amendment is somehow exempt from this mandate? Section 34 could not be clearer or more unequivocal. Today's majority opinion, which effectively holds that Section 34 does not mean what it so obviously says, is indefensible. This is especially true when one considers that this court has already held that Section 34 contains "clear, certain and unambiguous language" providing that "no other provision of the Constitution may impair the intent, purpose and provisions" of Section 34, including the home-rule amendment. *Bd. of Trustees of Pension Fund, supra*, at 107, 41 O.O. 2d at 412, 233 N.E. 2d at 137.

A review of the facts and holding in *Bd. of Trustees of Pension Fund, supra*, is extremely instructive. There,

---

[11] This provision refers only to the power of the General Assembly to pass laws. *Fuldauer* v. *Cleveland* (1972), 32 Ohio St. 2d 114, 123, 61 O.O. 2d 374, 379, 290 N.E. 2d 546, 552.

the municipality challenged the constitutionality of several sections of R.C. Chapter 742, which created a *state-controlled* disability and pension fund for the benefit of police and fire fighters and their dependents. It was contended that these sections, and particularly R.C. 742.26, which required cities to transfer the assets of their police and fire fighters' relief and pension funds to the state fund, violated various constitutional provisions, including the "home-rule" sections. This court rejected these contentions, citing Section 34, Article II of the Ohio Constitution. *Id.* at 107, 41 O.O. 2d at 412, 233 N.E. 2d at 137. In so holding, this court ruled:

"The creation and the administration, management, and the control of a state police and firemen's disability and pension fund, as provided in Sections 742.01 to 742.49, inclusive, of the Revised Code, is a valid enactment of the General Assembly by virtue of the provisions of Section 34, Article II of the Constitution of Ohio." *Id.* at syllabus.

A closer look at the Revised Code sections upheld in *Bd. of Trustees of Pension Fund* against a home-rule attack reveals that these sections were considerably more intrusive on a municipality's power of home rule than the conciliation statutes before us today. For example, at the time of the *Pension Fund* decision, R.C. 742.26 provided that "* * * the assets and liabilities of each police relief and pension fund * * * and of each firemen's relief and pension fund * * * shall be transferred to the police and firemen's disability and pension fund * * *" *controlled by the state* pursuant to R.C. 742.03. (131 Ohio Laws 303-304.) Former R.C. 742.27 provided that upon such transfer, the board of trustees of the state fund acquire "* * * all rights, interest and owner-

ship in all of such assets." (131 Ohio Laws 304.) R.C. 742.30 required cities transferring superseded funds to discharge all liabilities of such funds at certain minimum annual rates, beginning with two percent per year in 1969, and increasing to five percent per year in 1972 and each year thereafter for *fifty-five years*. (132 Ohio Laws, Part I, 395-396.) R.C. 742.33 and 742.34 *mandated* that *cities* shall pay to the state fund *an amount to be determined by the state board,* and even that such payments shall be made from the municipality's *general fund*. (131 Ohio Laws 308.)

Who were the members of this state board that had all this power and authority to order municipalities to pay out of their general funds whatever amounts the board determined would be necessary to keep the fund financially sound? The answer was to be found in R.C. 742.03: the board consisted of the Attorney General, the Auditor of State, a city fiscal officer, two city police department employees, and two city or township fire department employees. (132 Ohio Laws, Part I, 394-395.) This court, in 1967, upheld this provision as being within the authority of the General Assembly under the powers granted to it by Section 34, Article II of the Ohio Constitution. I remember it well. I was a Toledo city councilman at the time and we did as this court and the state board instructed. The Home-Rule Amendment had to yield to the omnibus mandates of Section 34 and to the will of the General Assembly.

It can readily be seen that the statutory scheme upheld in *Bd. of Trustees of Pension Fund* constituted a substantial infringement of local powers of self-government. Cities were ordered by the state to surrender their own funds to the state on terms fixed by the state. Municipalities'

"power of the purse" was not merely limited; it was bypassed completely. Under the conciliation statute before us today, the municipality retains considerably more authority. With regard to wages, as well as other questions, the municipality may negotiate an appropriate settlement with safety forces employees. It is only when negotiations break down completely that the conciliator steps in, and even then the options from which the conciliator must choose are controlled to a large extent by the municipality. See R.C. 4117.14(G)(7). The *Pension Fund* holding that Section 34, Article II overrides the home-rule provision and that the state may intrude on local self-government to the degree allowed in that decision is doubly persuasive when applied to today's case. Can it be seriously argued that the conciliator provision under scrutiny today is more intrusive than the provisions upheld in *Pension Fund?* The answer is obvious.[12]

Nor can the *Pension Fund* case be distinguished from the instant case on the basis that pensions are not "wages," and therefore not subject to mandatory collective bargaining under R.C. 4117.08(A). First, that statute requires collective bargaining of *"[a]ll matters pertaining to wages, hours, or terms and other conditions of employment * * *."* (Emphasis added.) Few would argue that pensions do not fall within this category. Second, the federal courts which have addressed the question under the National Labor Relations Act have overwhelmingly held that the term "wages" includes pensions. 18D Kheel, Business Organizations (1984), Section 19.02. See, also, *In re Inland Steel Co.* (1948), 77 NLRB 1.

---

[12] In a discussion added after this dissent was written, the lead opinion attempts to distinguish the *Pension Fund* case from the instant cause, an attempt that serves only to highlight the desperation with which the majority clings to its pre-ordained decision. First, the majority cites the fact that the *Pension Fund* court "* * * based its decision on its conclusion that local government employees are employees for purposes of Section 34, Article II." How this point constitutes a distinguishing factor is left to the reader's imagination. The majority then attempts to show that the legislative scheme upheld in *Pension Fund* was somehow different from the Section 34 argument in this case. The majority does this by going outside the record of this case and quoting extrapolated portions of briefs that have, of course, not considered the specific issues of this case or the law as reflected in R.C. Chapter 4117. This is the exact reason we have a rule, generally abided by, that we do not go outside the record of a given case (except to recognized authorities) to seek assistance in developing our respective positions. Be that as it may, an honest reading of the *complete* briefs in *Pension Fund* just does not support the position which the majority seeks to portray by use of selected portions. To answer further this third revision by the majority would serve no useful purpose since one of the objects of a dissent is to persuade and I have long ago given up the hope that this dissent will be read objectively by the majority. Dissent is indeed essential to an effective judiciary in a democratic society. *Ferguson* v. *Moore-McCormack Lines* (1957), 352 U.S. 521, 528 (Frankfurter, J., dissenting).

Suffice to say, at the time of the *Pension Fund* decision, the amount to be contributed by each municipality was fixed by an *appointed board.* See former R.C. 742.33 and 742.34 (131 Ohio Laws 308). Moreover, the state, not the municipality, continues to set the rates. R.C. 742.33 and 742.34. By conjuring up such transparently facile arguments to justify its failure to adhere to the *Pension Fund* decision, the majority succeeds only in stressing exactly how indistinguishable that decision is.

It is quite interesting to note that this court, at the time the *Pension Fund* case was decided, was composed of Chief Justice Taft and Associate Judges Zimmerman, Matthias, O'Neill (later Chief Justice), Herbert (who wrote the opinion), Schneider and (Paul W.) Brown. It would be very difficult to characterize such a court as "pro-labor" or "liberal." Yet a panel of that court *unanimously* found that Section 34, Article II was controlling. Today, a majority of this court, without so much as a pause, summarily ignores the holdings in *Pension Fund,* and in *Kettering, supra,* without even bothering to overrule those decisions.

## D
## City Budgets and the SERB Experience

In an attempt to defeat the conciliation provisions of R.C. Chapter 4117, appellant points to the alleged power of the conciliator to bankrupt a municipality by adopting a union salary demand which the employer cannot afford. This argument, which has a certain potency at first blush, is, in reality, unfounded. The employer's ability to pay is a mandatory consideration for the conciliator under the provisions of R.C. 4117.14(G)(7). That statute directs that the conciliator "* * * shall resolve the dispute between the parties by selecting, on an issue-by-issue basis, from between each of the party's final settlement offers, *taking into consideration the following*:

"* * *

"(c) * * * *The ability of the public employer to finance and administer the issues proposed* * * *.*" (Emphasis added.)

It could perhaps be argued that this statutory provision does not prevent a conciliator from adopting an employee proposal which would spell financial disaster for the public employer. However, the doomsayers who warn of such calamities are ignorant of the realities. Past practice has demonstrated that conciliators do not hesitate to reject an employee demand which they find to be beyond the financial means of the particular public employer. Likewise, in the fact-finding stage, fact-finders have demonstrated a readiness to accept the employer's claim of inability to pay.

For example, in a dispute between the Jackson County Sheriff and the Fraternal Order of Police ("FOP"), the conciliator rejected the final wage offer of the FOP on the basis that the public employer was in a state of financial distress, and could not afford the increase. *In the Matter of Conciliation Between the Jackson County Sheriff and Fraternal Order of Police* (May 14, 1987), SERB Nos. 86-MED-09-0900, 86-MED-09-0901, and 86-MED-09-0902. Similarly, a conciliator rejected a pay increase in a dispute between the FOP and the Trumbull County Sheriff's Department, again on the ground that the employer had an inability to pay. *In the Matter of Impasse Between Trumbull County Sheriff's Department and Fraternal Order of Police* (Mar. 16, 1987), SERB Nos. 86-MED-90-918 through 922. The employer's inability to pay was also the basis for the rejection of pay increases in the following decisions by fact-finders: *In the Matter of Impasse Between the City of Cortland and the Fraternal Order of Police* (July 19, 1987), SERB No. 86-MED-04-0465; *Sheriff of Wyandot County and Fraternal Order of Police* (Dec. 13, 1985), SERB Nos. 85-MF-09-4238 and 85-MF-09-4239; *In the Matter of City of Washington Court House and Internatl. Assn. of Firefighters, Local 2474* (Nov. 1, 1984), SERB No. 84-MF-05-1170. Thus, it can be seen that

where an employer's claim of inability to pay is bona fide, it is not likely to be ignored. In fact, the above decisions show that fact-finders and conciliators have been very careful to consider claims of financial incapacity, and will readily accept these claims in appropriate cases. Thus, when one understands the SERB experience with these cases, the dire predictions of municipal bankruptcies caused by unbridled conciliators may be put into proper perspective.

## E
### Stare Decisis

Reading today's decision, it is a bit surprising to find that not even a tip of the hat is given to an old, and *occasionally* valued friend: *stare decisis*. It is even more surprising when the following language is considered:

"The underlying rationale for *stare decisis* is the importance of constancy and consistency in law. In the absence of consistency and constancy the value of law in society is diminished. *We are therefore institutionally bound to uphold our prior decisions where time has vindicated the logic utilized to render the holding.*" (Emphasis added.) *Scott* v. *News-Herald* (1986), 25 Ohio St. 3d 243, 249, 25 OBR 302, 307, 496 N.E. 2d 699, 705 (Locher, J.).

"I believe in the doctrine of *stare decisis* and I will continue to support this doctrine, regardless of my personal predilections as to public policy in some particular area of the law. Precision and consistency are values of the highest order in judicial decision-making. Populist jurisprudence only creates unpredictability in the law. While understanding that the common law is not immutable, we should strive to follow past experience and precedent. * * *" *Scott, supra,* at 263, 25

OBR at 319, 496 N.E. 2d at 715-716 (Wright, J., concurring).

"I strongly conclude that the law as most recently announced * * * should be followed by the court in this case. To do otherwise again completely demolishes any remaining semblance of the doctrine of *stare decisis* in this state. The only change that has taken place which would conceivably alter our position as announced in * * * [recent] cases has been an intervening change of personnel on the court — precisely the type of changed circumstance that the doctrine of *stare decisis* has been relied upon to maintain the stability of the case law of this jurisdiction. What confidence may attorneys, judges and litigants have in the stability of the decisional law of this court? This query is self-answering." *Wilfong* v. *Batdorf* (1983), 6 Ohio St. 3d 100, 109, 6 OBR 162, 170, 451 N.E. 2d 1185, 1193 (Holmes, J., dissenting).

Given these pronouncements, it is worth noting that these three justices, all members of today's majority, have previously agreed that R.C. Chapter 4117 is a law of general nature. *State, ex rel. Dayton Fraternal Order of Police, supra,* paragraph one of the syllabus. Further, given the holdings in *Pension Fund, Dayton Fraternal Order of Police* and *Kettering, supra,* the issue before us today would seem to have been settled — and the only change is a change in "personnel on the court."

As so eloquently stated by Justice Roberts in his dissent to *Mahnich* v. *Southern Steamship Co.* (1944), 321 U.S. 96:

"The evil resulting from overruling earlier considered decisions must be evident. In the present case, the court below naturally felt bound to follow and apply the law as clearly announced by this court. If litigants and

lower * * * courts are not to do so, the law becomes not a chart to govern conduct but a game of chance; instead of settling rights and liabilities it unsettles them. Counsel and parties will bring and prosecute actions in the teeth of the decisions that such actions are not maintainable on the not improbable chance that the asserted rule will be thrown overboard. Defendants will not know whether to litigate or to settle for they will have no assurance that a declared rule will be followed. But the more deplorable consequence will inevitably be that the administration of justice will fall in disrepute. Respect for tribunals must fall when the bar and the public come to understand that nothing that has been said in prior adjudication has force in a current controversy.

"Of course the law may grow to meet changing conditions. I do not advocate slavish adherence to authority where new conditions require new rules of conduct. But this is not such a case. The tendency to disregard precedents in the decision of cases like the present has become so strong in this court of late as, in my view, to shake confidence in the consistency of decision and leave the courts below on an uncharted sea of doubt and difficulty without any confidence that what was said yesterday will hold good tomorrow * * *." *Id.* at 112-113.

I find the words of Justice Roberts to be particularly apt in the context of today's majority decision, which accords so little regard for relevant past precedents from this court. Today's majority, having done so, would seem to have set the stage for this case to be overruled when, possibly again, there is a change in "personnel on the court."

### III
### Public Policy

By striking down the mandatory conciliation provisions of the Public Employees' Collective Bargaining Act, today's majority, in addition to disregarding precedent, ignores the absolutely compelling public policy underlying this binding arbitration requirement.

R.C. 4117.14(I) provides that the decision of a conciliator in a collective bargaining dispute between a public employer and its safety forces "* * * constitutes a binding mandate to the public employer and the exclusive representative [of such safety forces] to take whatever actions are necessary to implement the award." Conciliation is the final of several steps which the parties may take under R.C. 4117.14 in their effort to resolve a collective bargaining dispute. Public employees who are not members of safety forces need not proceed to binding conciliation. Such employees have the option to strike under R.C. 4117.14(D)(2), an option which was not granted to safety forces. In withholding the right to strike from such employees, the General Assembly was obviously concerned with the dangers such strikes would pose to the public safety and welfare. The General Assembly wisely recognized, however, that without the right to strike, safety forces would have little strength to bring to the bargaining table. To compensate, the legislature provided for binding arbitration so that members of a safety force and their employer may obtain independent, binding review of their contract proposals. The decision of the conciliator is binding *on both parties,* whatever that decision may be. By striking down this provision, the majority leaves the Act, as it pertains to safety forces, without a heart. Absent binding conciliation, the bargaining rights of safety forces are so weakened as to become virtually useless. Safety forces are prohibited from striking. Now they cannot obtain binding ar-

bitration. What resource is left at their disposal?

Given the history of public employer-safety employee relations in this state prior to the passage of R.C. Chapter 4117,[13] the answer should be obvious. During those turbulent days, public employees, including safety forces, were also prohibited from striking, but frustrations stemming from employee powerlessness frequently erupted into illegal strikes. These frustrations will inevitably recur as a result of today's decision. Because binding conciliation was provided in exchange for withholding the right to strike from safety forces, such employees will be left without any bargaining strength. The public employer will have no incentive whatsoever to bargain on the question of wages and other terms of employment. The result will be a return to the turmoil preceding the enactment of R.C. Chapter 4117, when, under the unlamented Ferguson Act, public employees could not strike and also could not force their employers to bargain. Practically speaking, municipal safety employees will now be in the same position. Though the Ferguson Act prohibited such actions, strikes by public employees, including safety forces, plagued this state for years. By its holding today, the majority removes the *quid pro quo* given to safety employees in place of the right to strike. It can be argued, and it is not a position I encourage or accept, that the majority has now accorded safety forces the *de facto* right to strike.

The majority expends considerable energy demonstrating the alleged detriments of binding conciliation, quoting Professor Clyde Summers on some of the drawbacks of the process. The majority, however, downplays the fact that Professor Summers *accepts* conciliation for safety forces as a necessity to avoid "intolerable" strikes. Summers, Bargaining in the Government's Business: Principles and Politics (1987), 18 U. Tol. L. Rev. 265, 280. In any event, it has always been my understanding that it is not this court's function to question legislative judgment. The General Assembly has obviously decided that binding conciliation is the most appropriate method for dealing with impasses between safety forces and their employers. Whether the members of today's majority agree or disagree with that assessment is, or should be, irrelevant. As recently stated by Justice Wright, "it is not the function of the courts to decide constitutional cases on the basis of its members' personal views. This court must give the laws enacted by our elected representatives every in-

---

[13] In 1972, Ohio was tied for fourth place in the nation in the number of strikes by safety forces. By 1973, Ohio had moved up to second place. There were six strikes by police and fire fighters in this state in 1975, again placing Ohio second in the nation in the frequency of such strikes. The next year, 1976, saw the number of safety forces strikes increase by half, to nine. That year, Ohio gained the dubious distinction of ranking first in the nation, a position which we retained for three of the following four years. In 1980, Ohio experienced *fifteen* strikes by safety forces, involving 2,300 workers and costing 6,800 lost workdays. Work Stoppages in Government, 1972-1980, United States Department of Labor, Bureau of Labor Statistics Reports Nos. 434, 437, 453, 483, 532, 554, 582 and 629, and Bulletin No. 2110. Clearly, the situation had reached crisis proportions.

I have previously described my own personal experience, as a Toledo city councilman, with strikes by safety forces during the era of the Ferguson Act. See Introduction to Symposium: Collective Bargaining in the Public Sector with Emphasis on Ohio Public Sector Collective Bargaining (1987), 18 U. Tol. L. Rev. 255.

tendment of constitutionality. * * *"
*Central Ohio Transit Auth.* v.
*Transport Workers Union of America,
Local 208* (1988), 37 Ohio St. 3d 56, 64,
524 N.E. 2d 151, 157 (Wright, J., concurring in the syllabus and in the judgment).

## IV
## Logic

Finally, the decision of the majority today has certain nonsensical ramifications which the majority has apparently not considered. Today's holding, by its terms, strikes down the binding conciliation requirement of R.C. 4117.14(I) with regard to municipalities only, since only municipalities are protected by the home-rule provision of the Ohio Constitution. It follows that safety forces employed by counties or by the state, such as sheriffs and the highway patrol, are unaffected by our decision. The result will be that safety forces employed by a municipality will have fewer bargaining rights than those employed by a county or by the state. As an example: a sheriff's deputy and a city police officer could (and will) be standing next to each other at the same intersection directing traffic after, for instance, a Fourth of July fireworks display. The sheriff's deputy will have the full protection of the Act. The city police officer will not. This is illogical and unfair, and guarantees confusion in the bargaining process.

It is also interesting to note that appellant states in its brief that it has no quarrel with the Act as a whole, but objects only to the binding conciliation provision with regard to wage-setting for safety forces. If appellant's reasoning is accepted, however, the entire Act, not just R.C. 4117.14(I), would be unconstitutional. If, as appellant argues, the home-rule provision elevates appellant's authority to fix

wages above the legislature's power to adopt the Act, then appellant cannot be compelled to enter into collective bargaining at all. But appellant does not object to the entire Act. It challenges only that portion which operated in this case to appellant's disadvantage.

## V
## Conclusion

The majority's decision today is indefensible from every possible perspective. The lead opinion does not contain a single tenable basis for the conclusion that binding conciliation must fall. The carefully contemplated judgment of the General Assembly, which considered binding conciliation for safety forces an absolutely necessary exchange for withholding the right to strike, is held for naught. Judicial deference for legislative discretion is nowhere to be seen. Today's unfortunate decision might have been unavoidable if R.C. 4117.14(I) were truly inconsistent with the Ohio Constitution. However, no such inconsistency has even remotely been demonstrated, as indeed it cannot be.

Today's decision will certainly cause confusion in the law, a result which will inevitably flow from its perversion of legal precedents and distortion of the Constitution. However, the disastrous effects of the majority's holding will not end there. By depriving safety forces of their only means of obtaining a binding resolution of collective bargaining impasses, the majority places safety forces in an untenable position. The General Assembly withheld the right to strike in exchange for a privilege the majority has seen fit to revoke. The day will come when the needless folly of today's holding will be all too clear.

Of course it will be argued that if safety forces resort to strikes, the

public employer may secure an order enjoining the strike pursuant to R.C. 4117.15(A). However, injunctions were available prior to the enactment of R.C. Chapter 4117,[14] with little apparent effect. Even the specter of termination from employment, also a possibility under the Ferguson Act,[15] evidently proved to be an ineffective weapon against illegal strikes. Certainly termination is not a feasible alternative for the public employer faced with striking safety forces. A ready source of replacements for these highly trained professionals is simply not available.

Moreover, the majority's holding today thrusts our courts right back into the political thicket from which the General Assembly had so wisely and mercifully extricated us. By providing only limited appeal from binding conciliation, the legislature clearly meant to remove courts from the political fray which so often surrounds these controversies. This sensible and prudent measure will be completely frustrated by the defeat of binding conciliation.

Given the facts that the law is so clear, the public policy and the logic so compelling and the disastrous results of the majority opinion so inevitable, one can only speculate as to why a majority of this court would reach so far to embark on the course they have chosen today. Whatever the reason, and to many it will be obvious, the price to reach this pre-determined result is just too high. To remove the conciliator provision from the Act is like having Christianity without the threat of Hell. There is no day of reckoning!

In sum, this is a sad day for safety forces, for cities, and for the people of this state. Members of municipal police and fire departments, who put their own lives at risk every day for the safety of Ohio citizens, lose a vital protection which the General Assembly obviously intended them to enjoy. Cities will once again face the frightening prospect of disruptive and dangerous work slowdowns or stoppages by their safety forces. The people of Ohio will be deprived of a large part of the extraordinary success the new Act has achieved in maintaining labor peace in the public employment sector. In short, everybody loses.

Accordingly, I dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.

H. BROWN, J., dissenting. I believe that R.C. 4117.14(I) is constitutional because it falls within the grant of constitutional authority provided in Section 34, Article II of the Ohio Constitution. The analysis of this issue contained in Section I(C) of the dissenting opinion by Justice Douglas is complete, well-reasoned and persuasive. Since the Ohio Constitution itself authorizes the legislation in question, this should be the end of our inquiry. I would uphold the constitutionality of R.C. 4117.14(I).

---

[14] *Goldberg* v. *Cincinnati* (1971), 26 Ohio St. 2d 228, 55 O.O. 2d 468, 271 N.E. 2d 284, paragraph one of the syllabus.

[15] See former R.C. 4117.05.